82 So.2d 61 (1955)
Fred G. HAMILTON
v.
LUMBERMEN'S MUTUAL CASUALTY CO.
No. 4046.
Court of Appeal of Louisiana, First Circuit.
June 30, 1955.
Rehearing Denied September 15, 1955.
Writ of Certiorari Denied November 7, 1955.
Huckabay, Seale, Kelton & Hayes, Baton Rouge, for appellant.
Durrett & Hardin, Cadwallader & Dameron, Baton Rouge, for appellee.
LOTTINGER, Judge.
This is a suit in tort wherein petitioner seeks damages of $25,000 for physical pain and suffering, embarrassment, humiliation and invasion of his right to privacy. Trial was held before a jury and they returned judgment in favor of petitioner in the sum of $12,500. The defendant has appealed.
The facts show that prior to May 12, 1952, the defendant, Lumbermen's Mutual Casualty Co., had issued to petitioner, Fred G. Hamilton, a public liability and property damage insurance policy. Bodily injury liability under said policy was in the limits of $20,000 for each person, or $40,000 for each accident. The said policy was in effect on May 12, 1952.
On or about May 12, 1952, petitioner was involved in an automobile accident on the Belle Chasse Highway below Gretna, Louisiana. As a result of the accident, petitioner was seriously injured and was hospitalized. Mr. Leray W. Hebert was killed as a result of the accident.
The accident was reported to Lumbermen's Mutual Casualty Company, which immediately began an investigation thereof. As the petitioner was seriously injured and unable to give any information regarding same, the insurance company hit upon a scheme to run an advertisement in the *62 newspapers requesting the names of witnesses who saw the accident. General Gas Company, petitioner's employer at the time of the accident, was requested to let the insurance company run the ad over its name. Upon refusal, the insurance company, without any authorization whatsoever of the petitioner, ran the following advertisement in the New Orleans Times Picayune:
 "Auto Accident
 "May 12, 1952
"If you witnessed the automobile accident in which I was involved on the Belle Chasse Highway, just below Gretna, on the afternoon of Monday, May 12, or if you know of anyone who witnessed it, or if you have any information whatsoever concerning the accident, I would appreciate it if you would either write me at the address given below or telephone me collect. I am especially anxious to contact the gentlemen who drove back to Gretna to summon the police and ambulance.
 "Fred G. Hamilton
 "5110 Bienville Ave., New Orleans
 24 La., Telephone AUdubon 6122"
The evidence discloses that petitioner never did live at the address given. His address was 314 Bedford Drive, Baton Rouge, where he had lived since 1949. At the time the petitioner was listed in the Baton Rouge Telephone Directory. He was engaged to be married to a young lady in Baton Rouge.
The address listed in the advertisement, and the telephone number, was that of an employee of the defendant insurance company. The facts show that parties who called the given telephone number in response to the advertisement were answered by a young lady who claimed to be Mrs. Hamilton.
On Sunday, June 1, 1952, the day upon which the advertisement first appeared, petitioner was able to get out of bed for a short period of time and was visiting the home of friends following the accident. The home was that of Hal S. Phillips, on East Lakeshore Drive in Baton Rouge. Petitioner, who was then single, subsequently married Elsie Phillips, a sister of Hal Phillips. Hal Phillips and his brothers own General Gas Corporation. It was at the Phillips home on that Sunday, June 1, 1952, that this advertisement came to the attention of friends and acquaintances of petitioner, apparently occasioning much comment. Several other acquaintances, who were not present at the Phillips' home on that day, saw the advertisement and asked petitioner about it. It was nearly a week later that petitioner finally discovered who had signed his name to this advertisement giving the false information contained therein, and for what purpose.
The petitioner filed this suit seeking damages as follows:

For physical pain, suffering
and mental anguish $ 5,000.00
For embarrassment and humiliation 2,500.00
For invasion of his right of
privacy 5,000.00
For punitive damages 12,500.00
 __________
 Total $25,000.00

The Court below instructed the jury that the law did not authorize an award of punitive damages.
The jury gave judgment for petitioner in the sum of $12,500, evidently disallowing the punitive damages as charged by the lower court. Defendant appealed to the Supreme Court, however, the appeal was transferred to this Court. As part of petitioner's claim is for physical pain and suffering, this Court is the proper Appellate Court under the provisions of Article 7, Section 10, of the LSA-Constitution of Louisiana of 1921.
The record of this proceeding, which sustains the facts given above, clearly establishes the petitioner's claim that the defendant did, without authority, invade the privacy of the petitioner. The evidence establishes that said act of invasion on the part of defendant was wilful. We feel, as did the jury, that the petitioner is *63 due compensation for the unlawful act of the defendant.
Plaintiff, appellee, states in his brief and we quote with approval the following:
"What is the right of privacy?
"It has been defined in many different ways, but each definition conveys one meaning.
"It has been defined as `the right to be let alone' and as `the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity.' According to another definition, it is `the right to live without unwarranted interference by the public about matters with which the public is not necessarily concerned.' (See: Banks v. King Features Syndicate, D.C.N.Y., 1939, 30 F.Supp. 352; Brents v. Morgan, 1927, 221 Ky. 765, 299 S.W. 967 [55 A.L.R. 964]; Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972; cited in 138 A.L.R. 24; 77 C.J.S. [Right of Privacy, § 1, p.] 396, n[ote] 1.)
"It is a part of the general right of the immunity of the person. `It is like the right not to be maliciously prosecuted, the right not to be defamed.' It is the right to an `inviolate personality.' (See: Warren & Brandeis, `The Right to Privacy,' 4 Harvard Law Review 193, 205, 207.)
"However, although akin to the other personal rights, such as the right not to be assaulted or defamed, the right of privacy is a distinct and separate legal right. (See: Hazle[i]tt v. Fawcett Publications, D.C.Conn.1953, 116 F.Supp. 538.)
"`A violation of the right of privacy is a direct invasion of a legal right of the individual, and constitutes a tort.' (Pavesich v. New England Mut. L. Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68 [69 L.R.A. 101]; cited in 138 A.L.R. 25.)
"Prior to 1890, no court had recognized the existence of a right of privacy per se, but many courts had recognized and given effect to rights which, in essence, were the `right of privacy,' under the auspices of principles of property, contracts, libel, assault, confidential relations, etc. (See: 138 A.L.R. 25, 33, Comment, 5 Tulane Law Review 483.)
"The four best known early English cases in which the `right of privacy' was protected by a legal fiction are Pope v. Curl, 2 Atk. 342, 26 Eng.Rep. 608, 1741 (discussed in 1 Louisiana Law Review 665, 679), Gee v. Pritchard, 2 Swans 402, 36 Eng.Rep.R. 670, 1818 (discussed in 5 Tulane Law Review 483, note 3; 29 Harvard Law Review 640, 642; 4 Harvard Law Review 193, 200), Prince Albert v. Strange, 2 De G. & S. 652, 64 Eng. Rep. 293, Aff. 1 Mac. & G. 25, 41 Eng. Rep.R. 1171, 1849 (discussed in 5 Tulane Law Review 483; 4 Harvard Law Review 193, 204, 205; 138 A.L.R. 25, 26, 34), and Pollard v. Photographic Co., L.R. 40 Ch.Div. (Eng.) 345, 1888 (discussed in 5 Tulane Law Review 483; 4 Harvard Law Review 193, 200, 138 A.L.R. 33.)
"Following the early English view, the fiction of contract, property or other rights, is still employed to protect the right of privacy, in England and in a few American jurisdictions. (See: 138 A.L.R. 26, 33, 34.)
"However, in 1890, the famous article by Samuel D. Warren and Louis D. Brandeis (later Supreme Court Justice) was published, and transformed the general American attitude toward the right of privacy.
"The Warren-Brandeis article was entitled `The Right to Privacy' and originally published in 4 Harvard Law Review 193.
"In this article the authors pointed out the development of the concept of the right of privacy, laid down certain basic principles which should govern its application, and urged that it be *64 accepted as a distinct and separate legal right.
"Generally considered the first case in the United States to squarely affirm the principle of the right of privacy is Pavesich v. New England Mut. L. Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68, in which a photographer was enjoined from the unauthorized use of a photograph for advertising purposes. (See: 1 Louisiana Law Review 665, 686.)
"Subsequent to the publication of the Warren-Brandeis article and the decision in the Pavesich case, the acceptance by many American jurisdictions of the doctrine of privacy was rapid and complete. * * *
"Louisiana also recognizes this right.
"In 138 A.L.R. 28, it is stated:
"`* * * the preponderance of authority supports the view that, independently of the common rights of property, contract, reputation, and physical integrity, there is a legal right called the right of privacy, the invasion of which gives rise to a cause of action.
"`(Citations.):
"`LouisianaItzkovitch v. Whitaker (1905) 115 La. 479, 39 So. 499, 1 L.R.A. (N.S.) 1147, 112 Am.St.Rep. 272 (affirmed on rehearing in (1906) 117 La. 708, 42 So. 228, 116 Am.St.Rep. 215) (photographing plaintiff for "rogue's gallery"); Schulman v. Whitaker (1906) 117 La. 704, 42 So. 227, 7 L.R.A. (N.S.) 274, 8 Ann.Cas. 1174 (affirming on rehearing (1905) 115 La. 628, 39 So. 737 (same). See also Schwartz v. Edrington (1913) 133 La. 235, 62 So. 660, 47 L.R.A.(N.S.) 921, Ann.Cas. 1915B, 1180) (publication of plaintiff's name on list of petitioners for incorporation of a village). And see Denis v. Leclerc (1811) 1 Mart. [O.S.], 297, 5 Am.Dec. 712 infra, VIII f.' (Emphasis supplied.)
"Both jurists and legal writers alike have apparently recognized that Louisiana is among the many states which have accorded recognition to the right of privacy. (See: Opinion, Judge Hincks, Hazle[i]tt v. Fawcett [Publication, Inc.], D.C.Conn.1953, 116 F.Supp. 538, 542; Comment, Professor Felix Stone, `Tort Doctrine in Louisiana: The Concept of Fault,' 27 Tulane Law Review 1, 8.)
"The first case in which Louisiana recognized and enforced what was apparently essentially the right of privacy is Denis v. Leclerc, 1811, 1 Mart., O.S., 297.
"In the Leclerc case, this Court affirmed the lower Court's injunction of the publication by the defendant of a private letter written by the plaintiff and also affirmed the judgment for contempt incurred by the defendant for placing an advertisement in the paper inviting the public to come to his office and view the letter.
"Of course, in the Leclerc case, as in the early English cases, the right of privacy was enforced as a quasi-property right, citing the old English case of Pope v. Curl, 2 Atk. 342, 26 Eng. Rep. 608, 1741, mentioned supra herein. (See: Comment: 1 Louisiana Law Review 665, 680.)
"The Leclerc case is discussed as a forerunner of the modern concept of the right of privacy in a discussion by Professor Dale E. Bennett to be found in 1 Louisiana Law Review 665, at page 680. An author who agrees with Professor Bennett states, in 21 Tulane Law Review 289, at page 291:
"`The right of privacy has long been established in Louisiana. As early as 1811, the right was invoked although not specifically described as such. Denis v. Leclerc, 1811, 1 Mart., O.S., [La.] 297; * * *.' (Emphasis supplied.)
"In the cases of Schulman v. Whitaker, 1905, 115 La. 628, 39 So. 737 [Id.], 1906, 117 La. 704, 42 So. 227 [7 L.R.A., *65 N.S., 274], and Itzkovitch v. Whitaker, 1905, 115 La. 479, 39 So. 499 [1 L.R.A., N.S., 1147; Id.], 1906, 117 La. 708, 42 So. 228, an injunction was issued to restrain the inspector of police of the city of New Orleans from having plaintiffs' photographs taken, placing a copy in the City Rogues' Gallery and sending copies to other cities.
"In the Itzkovitch case, this Court considered and refused to follow the case of Roberson v. Rochester Folding Bed [Box] Co., [171] N.Y. [538], 64 N.E. 442, 59 L.R.A. 478, 89 Am.St.Rep. 828, the leading case setting forth the New York rule denying recognition to the right of privacy. (See: 138 A.L.R. 35.)
"In the Itzkovitch case, the Court said that `* * * everyone who does not violate the law can insist upon being let alone (the right of privacy).'
"Both the Schulman and the Itzkovitch cases are cited in 138 A.L.R. 28, in support of the proposition that Louisiana is aligned with those jurisdictions recognizing the right of privacy.
"Both the Schulman and Itzkovitch cases are cited in illustration of the doctrine of the right of privacy in discussions to be found in 21 Tulane Law Review 289, at page 291, and in 5 Tulane Law Review 483, at page 484.
"In 16 Tulane Law Review 639 at page 640, the following statement is made:
"`In Louisiana, some eighty years before the Warren-Brandeis article, a right which we might now term "right of privacy" was protected by the supreme court in approving an injunction granted against the publication of a private letter. Denis v. Leclerc, 1811, 1 Mart. [O.S.] 297. Since then the right of privacy has become recognized as a separate right. Itzkovitch v. Whitaker, 1905, 115 La. 479, 39 So. 499 [1 L.R.A.,N.S., 1147]; Schulman v. Whitaker, 1905, 115 La. 628, 39 So. 737; * * *.'
"The next case in Louisiana concerning the right of privacy is Schwartz v. Edrington, 1913, 133 La. 235, 62 So. 660 [47 L.R.A.,N.S., 921].
"In the Schwartz case, this Court, citing Denis v. Leclerc, supra, approved the injunction issued to prevent the publication of a petition for the incorporation of the village of Gretna containing plaintiffs' names when it appeared that plaintiffs had changed their minds as to the desirability of incorporation and withdrawn their names.
"The Schwartz case is cited in 138 A.L.R. 28, as a general illustration of the right of privacy and again in 138 A.L.R. 63, 81, as an example of the violation of the right of privacy by the unauthorized use of an individual's name.
"The Warren-Brandeis article, the article which gave the initial impetus to the development of the theory of the right of privacy and which is still the touchstone used in the decision of all unsettled cases involving invasions of the right, contemplated that the remedies for an invasion would be:
"`1. An action of damages in all cases. Even in the absence of special damages, substantial compensation could be allowed for injury to feelings as in the action of slander and libel.
"`2. An injunction in perhaps a very limited class of cases' ("The Right of Privacy," 4 Harvard Law Review 193, 219)."
In addition to the above there are many states that recognize the right of privacy.
While not in any manner attempting to justify the acts of the defendant, we do, however, believe that there are certain mitigating circumstances which must be considered in fixing the quantum of damages. *66 First of all the accident was a fatal one and there was the possibility that both defendant and petitioner might be made party defendants in a suit filed by the heirs of the deceased. It was very likely that the amount of damages to be claimed by the heirs of decedent might be in excess of the policy limits, and the evidence shows that a claim was filed in Federal Court for damages in excess of said sum. By making an immediate and complete investigation of the accident, the insurance company would possibly have information on hand which might be of great benefit to both the defendant and the petitioner. We might add that there is no obligation on the part of the company to investigate accidents but the company is obligated "to defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient." We find another provision in the policy which provides "the insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."
It is defendant's contention that had the advertisement been run over its name, there might not have been as much response because of the general antagonism against insurance companies.
While these factors are being considered we might say to the contrary that the General Gas Company refused permission to use its name in the advertisement, and they might well be held in damages as petitioner's employer.
The facts show that an investigator of the defendant company did call to speak with petitioner about the accident, but was unable to get any information because of petitioner's condition. It was after this that the decision was made to run the advertisement.
The defendant has filed exceptions of no cause or right of action in this Court as to the petitioner's claim for "physical pain, suffering and mental anguish." We do not believe said exceptions to be well founded. The evidence clearly shows that petitioner suffered great mental anguish on being notified of the advertisement. Dr. Gilliland testified as follows:
"The obscure circumstances surrounding the insertion of the advertisement in the New Orleans paper was certainly additional trauma at this critical time in the patient's convalescence, and it must certainly be regarded as a deleterious factor in his recovery. At the time I first saw the patient he had again begun to settle down and was making a reasonably good adjustment and recovery.
"I cannot see that the incident of the advertisement will have any permanent damaging effects on the patient's condition, but I do see it as a piece of additional trauma at a very inopportune time as far as his convalescence is concerned. It created unnecessary anxiety during a period in which he was making an emotional as well as a physical recovery, and after the initial effects of the anxiety had subsided, his feeling of anger and resentment at the entire proceeding tends in itself to be a drawback to his uneventful recovery."
The Supreme Court in its decision on this case, see 226 La. 644, 76 So.2d 916, held this suit to involve physical injuries by virtue of its transferring the matter to this Court. Without physical injuries, this suit would properly be appealable to the Supreme Court and not the Court of Appeal.
The fixing of damages in a suit of this nature is always a difficult problem. The facts show that petitioner was greatly disturbed and mentally upset upon being informed of the advertisement. Dr. Gilliland *67 testified that the advertisement greatly disturbed and upset the petitioner at a critical time in the patient's convalescence from the injuries sustained in the accident. The petitioner was several days in finding the answer as to who had placed the advertisement in the newspaper, which must have disturbed him to a great extent, particularly considering the fact that he had just sustained serious injuries in the automobile accident. He testified that he was under the belief that it was run by the other parties to the automobile accident, however, he could not imagine they would use his name.
The advertisement was run in the New Orleans Times Picayune, a newspaper of great circulation through the State of Louisiana and the surrounding territories. To add to petitioner's anxiety and concern, it was shown that parties who telephoned in reply to the adverisement were answered by a young lady who claimed to be petitioner's wife although petitioner was single at the time.
Considering all the circumstances as hereinabove related, we feel that petitioner is entitled to damages in the sum of $3,000 for the unlawful invasion of his privacy, and for physical pain, suffering and mental anguish and for embarrassment and humiliation. The judgment of the lower court will be reduced to said sum.
For the reasons assigned, the judgment below in favor of petitioner is amended so as to reduce the amount of damages to the sum of $3,000, and as so amended the judgment is affirmed. All costs of this appeal will be paid by petitioner.
Judgment amended and as amended affirmed.
ELLIS, Judge (dissenting in part and concurring in part).
While I agree that the unauthorized signing of plaintiff's name to the advertisement would render the defendant liable for any damages which plaintiff suffered as a result thereof, I am of the opinion in the present case that the plaintiff has proven no actual damages.
The plaintiff was in an automobile collision on the 12th day of May, 1952, in which the sole occupant and driver of the other car in the collision was killed. The next morning, May 13, 1952, the Times Picayune newspaper carried a front page account of the accident, naming plaintiff as well as the deceased. Plaintiff's insurer, as a result of its investigation, found out that there was a witness to the accident but that no one knew his name or his address, and upon being informed that the plaintiff, who was in the hospital at the time, was too ill to discuss the matter, and also being warned not to mention the fact that the driver of the other car had been killed, refrained from asking plaintiff to give his permission for his name to be signed to an advertisement which had for its purpose the location of the missing witness, and for this reason plaintiff's insurer signed plaintiff's name to the advertisement and gave his address as being in the city of New Orleans, when, as a matter of fact, he was a resident of Baton Rouge.
Giving the plaintiff's wrong address did not damage him in any manner, shape or form, as shown by this record. The only act committed by plaintiff's insurer which could subject it to damages was the actual signing and publication of the plaintiff's name without his authority. The subject matter of the advertisement had been widely publicized on the front page of the Times Picayune and contained nothing of a damaging nature.
Although plaintiff was treated by a number of doctors in the City of New Orleans, not one was brought to testify that he had been damaged one iota as a result of the unauthorized signing of his name to the advertisement. In fact, plaintiff himself at no time in his testimony showed that he had suffered any mental anxiety or pain or that it had made him more nervous or given him a setback. In fact, when he was asked *68 on cross-examination just before being excused if they had sought his permission would he have allowed his name to be signed to the advertisement, he frankly stated that he couldn't say that he would or would not. This is not the testimony of one who had suffered much mental pain or anxiety as a result of the unauthorized use and signing of his name to the advertisement in question.
There is testimony of one doctor to whom the plaintiff was sent in August 1952 for the purpose of securing the testimony of the doctor in this case. This doctor's testimony in my opinion is worthless; it is based completely upon what the plaintiff is supposed to have told this doctor.
It appears from the record that this plaintiff made a remarkable recovery without any setbacks, and that if damages are to be awarded where there is no proof but for illegal and unauthorized signing and publication of plaintiff's name, that $500 would be ample under the facts of this case.
In addition to the above, it is shown that although plaintiff was not individually insured, that his employer together with his insurer, were sued for more than $100,000 or many times the policy coverage, and the location of this witness was not only important but beneficial to the interest of the plaintiff as well as his employer and his insurer. There is no malice shown nor any intention other than to carry out the terms of the insurance contract for the benefit of the insurer and plaintiff.
I therefore concur in the holding that the defendant-insurer had no legal right to sign plaintiff's name to the advertisement without his authority and if there were any damages plaintiff would be entitled to an award commensurate with the proof, but for the reasons above stated, I think an award of $500 would be ample.
Rehearing denied. ELLIS, J., dissents.