263 So.2d 460 (1972)
Robert Carson LOVE, Plaintiff-Appellee,
v.
SOUTHERN BELL TELEPHONE AND TELEGRAPH CO. et al., Defendants-Appellants.
No. 8850.
Court of Appeal of Louisiana, First Circuit.
May 29, 1972.
Rehearing Denied June 26, 1972.
Writ Refused September 20, 1972.
*461 Henry D. Salassi, Jr. and Paul M. Hebert, Jr., Breazeale, Sachse & Wilson, Baton Rouge, for appellant.
William H. Brown, Howell & Brown, Baton Route, for appellee.
Before LOTTINGER, SARTAIN and ELLIS, JJ.
SARTAIN, Judge.
This is an action in tort stemming from an alleged invasion of privacy and acts of trespass. Defendants are Southern Bell Telephone and Telegraph Company and two of its supervisory employees, Royce Bordelon and Harry W. Crute. The matter was tried before a jury which found in favor of the plaintiff and returned a verdict against the defendants, in solido, in the sum of $15,000.00. Judgment was signed accordingly, defendants have appealed and we affirm.
Defendant, Harry W. Crute, serves Southern Bell as District Construction Foreman, and as such was plaintiff's immediate supervisor. Defendant, Royce Bordelon, is Division Construction Foreman and Crute's immediate supervisor.
Plaintiff, Robert Carson Love, had been employed by Southern Bell for some thirty-two years. Since 1946 he had served in a supervisory capacity of one form or another. On April 9, 1968, he was a Cable Splicing Foreman. He resided alone in a house trailer.
Plaintiff's duties required that he report for work between 6:15 and 6:30 a.m. o'clock each morning. This permitted him to give work assignments so that cable crews under his supervision could leave for their various job locations by 7:00 a.m. During the course of any given day, plaintiff would personally visit the crews to ascertain if any problems had arisen and to assure himself that the work was being performed properly.
On the morning of April 9, 1968, plaintiff failed to appear at the accustomed time. David H. Crawford, a cable splicer who was to be assigned that day's work by plaintiff, reported the latter's absence to *462 Mr. Crute. Mr. Crute then asked Crawford to phone plaintiff's trailer, which he did, but received no response. Crute then personally made plaintiff's assignments and after having done so, decided to go to plaintiff's trailer. He did not know the exact location of the trailer park but was able to find it. He observed the company's pickup truck parked in front of a trailer, which he presumed to be plaintiff's abode. He did not endeavor to knock or arouse plaintiff but did observe that the windows in the vehicle were down, the keys were in the ignition, and the floor in the cab was wet from the previous night's rain. These observations were made at approximately 7:45 a.m. Mr. Crute then decided to return to the company's area location and reported plaintiff's absence to Mr. Bordelon.
Crute stated that plaintiff, on the previous day, had asked permission to take time off to see a doctor because he, plaintiff, "thought he might have diabetes". Mr. Bordelon testified that he and Crute were concerned about plaintiff's health and the two decided to return to the trailer park. On arrival there, they contacted the proprietor and the three of them proceeded to plaintiff's trailer. They observed the truck, as previously described, the lights on in the trailer, and the air conditioner running. They knocked loudly on the front door and received no response. They then went to the side of the trailer near the spot where they presumed plaintiff's bedroom was situated and knocked heavily on the exterior wall. Again, they received no response. Messrs. Crute and Bordelon reiterated that their failure to arouse the plaintiff caused them to be even more concerned about plaintiff's physical well-being. They asked the proprietor if he had a passkey. He did not but stated he would see if the person from whom the trailer was purchased did. He called and determined that no key was available. Messrs. Crute and Bordelon then decided that they would summon a professional locksmith to open the door. This, in their judgment, was a better alternative than to forcibly pry the door open and thereby destroy it.
Mr. Bordelon had a 10:00 a.m. appointment with his own physician and so he left before the locksmith arrived at about 10:30 a.m. The door was opened and Crute, the proprietor and the locksmith entered. Mr. Crute described the situation thusly:
"* * * Mr. Love was on his face and he was holding his head and he was in pain, it seemed like to me and therethe mattress was half on the bed and half on the floor and he had vomited on the floor, the mattress had been vomited on and the floor had been vomited on and they had four empty whiskeythree empty whiskey bottles and one bottle on the table with about two inches of whiskey in the bottom and a wine bottle empty and I guess a dozen beer cans empty."
Mr. Crute asked plaintiff if he could help him and plaintiff said "no". He then asked plaintiff if he could be in his office at 1:00 p.m. and stated that plaintiff answered "yes". Crute returned and when plaintiff failed to appear at 1:00 p.m., Crute and Bordelon, accompanied by a Mr. McCormick, another cable splicing foreman, returned to plaintiff's trailer. They knocked, received no answer, and entered. They observed plaintiff in the bed, asleep, and apparently in no distress, so they departed. On leaving the trailer this time, Crute observed that a portion of the whiskey in the bottle on the table in the trailer had been consumed since his first visit.
Both Crute and Bordelon acknowledged that they did not have plaintiff's permission to obtain a locksmith to open his trailer door or to enter his trailer on either occasion. However, they steadfastly maintained that their principal reason for doing so was motivated by their concern for plaintiff's health.
Plaintiff strongly argued that he was ill and not intoxicated, that he had taken certain medication that had caused him to become ill. He explained that he did not drink but kept intoxicants in his trailer for his friends. Several witnesses testified that they had visited in plaintiff's trailer, *463 had been offered and accepted a drink, and that plaintiff did not partake with them. He strenuously rejected any humanitarian interest in him by Crute and Bordelon but attributed their actions as designed to "get him". One witness testified that Bordelon had previously told him that plaintiff was not a fit person to work for the company and that the witness should be on the lookout for facts that would give grounds for plaintiff's dismissal. Bordelon denied having ever made such statement.
Plaintiff further argues that if Crute had been truly concerned about him he would have endeavored to assist him at 7:30 a.m. on the morning of April 9, 1968. Crute, on cross-examination, explained that at that time he thought plaintiff had overslept and did not see any reason to try to awaken him. Plaintiff also contends that a doctor or an ambulance could have been called instead of a locksmith. Crute, when at the trial of this matter some forty-three months later, was asked how he could recall with such certainty the condition of plaintiff's trailer, including the location of the whiskey bottles, the brand, the reduction of the bottle contents between his two visits, and the beer cans, etc. He stated that he reduced his observations to writing at that time and refreshed his memory from such notes.
Plaintiff further questions Bordelon's motives because Bordelon left even before the locksmith arrived and his (plaintiff's) condition could be determined.
Plaintiff also contends that it was company policy to have extra witnesses, when possible, when an employee's conduct or activity was being investigated. Hence, he assigns this as the reason McCormick accompanied Messrs. Crute and Bordelon when they returned to the trailer at 1:30 p.m. McCormick was not called to testify but a former employee did (for the plaintiff) and corroborated the additional witness aspect.
We have recited above a fairly detailed account of the facts because as will be stated below, the determination herein as to liability is one of fact, i.e., whether Messrs. Crute's and Bordelon's actions were reasonable under the circumstances. This is the issue that was put to the jury. However, before we discuss the application of these facts to the law, we must dispose of an exception presented to and rejected by the trial judge and again urged here.
The exception is one of res judicata, wherein Southern Bell asserts that under date of June 6, 1968, it entered into a compromise settlement with plaintiff. It is in letter form, addressed to Mr. G. H. Northrop, Division Plant Manager, signed by plaintiff, and witnessed by Northrop and Crute. The letter provides as follows:
"In a meeting of June 5, 1968 involving myself, G. H. Northrop, Division Plant Manager, Baton Rouge, Louisiana and H. L. Crute, District Construction Foreman, Baton Route, Louisiana. I agreed that I would accept termination pay of $8000.00 plus $800.00 for 4 weeks vacation pay. This totals $8,800.00 before taxes.
"As a result of this payment I will release Southern Bell Telephone & Telegraph Company of any and all responsibility on my behalf. I further request that this payment be expedited." (Emphasis ours)
Southern Bell contends that the emphasized portion releasing it from "any and all responsibility" is just that and encompasses the claim herein asserted. Plaintiff counters that the letter represents a settlement on his behalf of any claim he might have for "termination pay" and was not intended to nor does it release Southern Bell from damages arising out of the tort asserted in this action.
A compromise is a bi-lateral contract, which must be reduced to writing, whereby the parties adjust their differences by mutual consent. C.C. Article 3071. Once the agreement is signed it has the authority of things adjudged. C.C. Article 3078.
*464 However, C.C. Article 3073, which delineates the scope of a compromise transaction, provides:
"Art. 3073. Scope of transaction
"Art. 3073. Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises."
With the above in mind we look to the circumstances surrounding the transaction.
When plaintiff returned to work on April 18, 1968, Mr. Bordelon advised him that he could not remain with Southern Bell in a supervisory capacity. He gave plaintiff three alternatives; (1) that he could take a position as a craftsman in another community (2) apply for a pension, or (3) resign from his employment and be given severance or termination pay. With respect to the pension request, plaintiff was informed that the decision was up to the "committee" and no one could assure him of the result. Plaintiff inquired as to his entitlement to severance pay and was told that there were no specific rules as to either severance or termination pay. Plaintiff then stated that he would have his attorney contact the company. Mr. Bordelon subsequently declined to discuss the matter of severance or termination pay with plaintiff's counsel, stating that it was an internal matter relating to the company and an employee (plaintiff). Plaintiff testified that he then commenced discussions with his superiors as to severance or termination pay. These discussions culminated in the letter of June 6, 1968.
The fact that there were no specific company rules as to the amount of such severance or termination pay lends credence to plaintiff's contention that this was the sole subject matter of his individual negotiations with his superiors. Further, the letter itself, in the first paragraph, states that plaintiff "would accept termination pay". Additionally, from the payment of $8,800.00, the sums of $2,119.54 and $129.77 were withheld for federal and state income taxes, respectively. Such items are clearly not deductible in settlement of a potential or pending tort claim.
Additionally, the record does not contain one single word that there was any mention of the events of April 9, 1968, either prior to, during, or subsequent to the letter of June 6, 1968, when it was signed and the payment made to plaintiff. Finally, Mr. Crute, who witnessed the instrument, and Mr. Bordelon did not offer any evidence to the contrary, save only to say that the company had no specific rules on termination or severance pay. Mr. Northrop did not testify.
We realize that parol evidence is not admissible to alter or vary the express terms of a compromise transaction. However, this is not the situation here. The first paragraph of the letter states that payment was for termination pay and it necessarily follows that what plaintiff released was any responsibility of the company for future claims by him for severance or termination pay, which was to be considered if plaintiff elected alternative (3) above and resigned from his position.
We now turn to the merits of this litigation.
In Hamilton v. Lumbermen's Mutual Casualty Co., La.App., 82 So.2d 61 (writs refused, 1955) we reviewed extensively the *465 jurisprudence of this state and others relative to one's right of privacy. There we said in part: (82 So.2d 61, 63, 64)
"What is the right of privacy?
"It has been defined in many different ways, but each definition conveys one meaning.
"It has been defined as `the right to be let alone' and as `the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity.' According to another definition, it is `the right to live without unwarranted interference by the public about matters with which the public is not necessarily concerned.' (See: Banks v. King Features Syndicate, D.C.N.Y., 1939, 30 F.Supp. 352; Brents v. Morgan, 1927, 221 Ky. 765, 299 S.W. 967 [55 A.L.R. 964]; Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972; cited in 138 A.L.R. 24; 77 C.J.S. [Right of Privacy, § 1, p.] 396, n[ote] 1.)"
* * * * * *
"Louisiana also recognizes this right.
"In 138 A.L.R. 28, it is stated:
"`* * * the preponderance of authority supports the view that, independently of the common rights of property, contract, reputation, and physical integrity, there is a legal right called the right of privacy, the invasion of which gives rise to a cause of action.'
* * * * * *
"The first case in which Louisiana recognized and enforced what was apparently essentially the right of privacy is Denis v. Leclerc, 1811, 1 Mart., O.S., 297.
"In the Leclerc case, this Court affirmed the lower Court's injunction of the publication by the defendant of a private letter written by the plaintiff and also affirmed the judgment for contempt incurred by the defendant for placing an advertisement in the paper inviting the public to come to his office and view the letter.
"Of course, in the Leclerc case, as in the early English cases, the right of privacy was enforced as a quasi-property right, citing the old English case of Pope v. Curl, 2 Atk. 342, 26 Eng.Rep. 608, 1741, mentioned supra herein. (See: Comment: 1 Louisiana Law Review 665, 680.)
"The Leclerc case is discussed as a forerunner of the modern concept of the right of privacy in a discussion by Professor Dale E. Bennett to be found in 1 Louisiana Law Review 665, at page 680. An author who agrees with Professor Bennett states, in 21 Tulane Law Review 289, at page 291:
"`The right of privacy has long been established in Louisiana. As early as 1811, the right was invoked although not specifically described as such. Denis v. Leclerc, 1811, 1 Mart. O.S., [La] 297; * * *' (Emphasis supplied.)"
The Right of Privacy in Louisiana is the subject of an article found at 28 LLR 469. After reiterating the various definitions as quoted above from Hamilton, the author states: (28 LLR 469, 470)
"These definitions because of their very broad language are of little, if any, assistance to a court in resolving a case involving the right of privacy. In order reasonably to limit the area of protection afforded under the right of privacy, the courts in Louisiana, either expressly or tacitly, have distinguished between `actual' and `actionable' invasions of the right of privacy with legal redress being granted only when the invasions are deemed to be actionable. Since this distinction is the crucial determinate of whether recovery will be allowed, much discussion will be devoted to the test used by the courts to ascertain whether certain conduct is an actionable invasion of the right of privacy. As employed by the courts, the word `actual' describes *466 conduct for which no recovery will be granted even though such conduct may seem to invade the right of privacy as that right has been so broadly defined.
"It is evident that malicious intent is not necessary in order to have an actionable invasion of the right or privacy, and that truth and the absence of malice are not defenses to such an action. In determining the criterion for liability the courts have looked to what was done rather than the precise motives which accompanied the acts. A few Louisiana decisions have referred specifically to section 867 of the American Law Institute's Restatement of Torts as the test to be used in determining whether certain conduct constitutes an actionable invasion of the right of privacy. Section 867 provides:
"`A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.'"
We do not subscribe to defendants' argument that Hamilton and the authorities cited therein are inapposite because they relate to "publication concerning the manner in which a man lives, ...", etc. Our courts have recognized that physical intrusions are actionable if conducted in an illegal manner. Souder v. Pendleton Detectives, Inc., 88 So.2d 716 (1st La.App., 1956). Further, it is the established law of this state that C.C. Art. 2315 "is broad in its scope and contemplates redress to all who suffer injury as a consequence of an offense or quasi offense, including the right to recover compensatory damages though unaccompanied by physical injury. Quina v. Roberts, 16 So.2d 558 (Orl.La.App., 1944); Graham v. Western Union Tel. Co., 109 La. 1069, 34 So. 91; Tuyes v. Chambers, 144 La. 723, 81 So. 265.
With the above authorities as guidelines we look to the case at bar and must determine whether or not the acts of Messrs. Crute and Bordelon were reasonable under the circumstances. Stated another way, were their reasons for entering plaintiff's trailer motivated by a desire to help, accentuated by their concern for his health, or were they in the furtherance of their employer's interest and designed to prove plaintiff's unworthiness as a supervisory employee.
Plaintiff concedes that for humanitarian reasons, a person may without invitation enter another's home and though it be an invasion in fact, it would be an "actual" one and not compensable. But as here, the intrusion was twice, accompanied by the taking of notes, bringing in another employee (McCormick) as an additional witness, all resulting in serious disciplinary action by his employer, plus seriously damaging his reputation. Counsel argues here as he did to the jury that the second entry certainly was unreasonable and reflects unfavorably upon the averred good intentions of Messrs. Crute and Bordelon when they entered his trailer on the first occasion.
The jury resolved the issue in favor of the plaintiff, obviously determining that the acts complained of were unreasonable. With this conclusion we can find no manifest error.
Southern Bell urges, that in the event the acts of Messrs. Crute and Bordelon are deemed unreasonable and actionable, that these two employees were not acting within the course and scope of their employment so as to exonerate it of any vicarious liability. We must reject this defense. Assuming arguendo that Crute and Bordelon initially acted on their own judgment, it would necessarily follow that the company would refrain from availing itself of any use or benefit of any information so obtained. In short, the company would completely disassociate itself with and repudiate the acts complained of. Here, the company has done neither. To the contrary, it used such information to discipline plaintiff by giving him the alternatives *467 listed above, which decision was obviously made at a higher echelon. It cannot reject with one hand and receive with the other. Under these circumstances we conclude that Messrs. Crute and Bordelon were acting within the course and scope of their employment; and if not, the actions of its employees were condoned and ratified.
We now direct our attention to quantum. Defendants urge that the amount awarded to plaintiff is excessive and should be reduced substantially. Plaintiff asks that the award be affirmed. This being a jury case we are, of course, without the benefit of its deliberations as it concerns damages and more particularly any itemization thereof. The record reflects that the incident became rather common knowledge throughout the area serviced by Southern Bell. It was discussed in one area of South Louisiana that plaintiff was drunk. Apparently, the story became enlarged in certain quarters to include such factors as plaintiff's morals and the presence of members of the opposite sex in his trailer at the time. Other reasons, none complimentary, were assigned for his having been "fired".
In Pack v. Wise, 155 So.2d 909 (3rd La. App., 1963) the court awarded a young bank employee, whose employment was terminated, the sum of $5,000.00 for both special and general damages. Here, plaintiff had thirty-two years' service and was earning $800.00 per month. He possessed no other skills which would qualify him for employment elsewhere that would afford him similar income. Further, his reputation was severely damaged as aforesaid. Under these circumstances we do not consider that an award of $15,000.00 is an abuse of such discretion as is vested in the jury by C.C. Art. 1934(3).
Accordingly, for the above and foregoing reasons, the judgment appealed from is affirmed at appellants' costs.
Affirmed.