530 So.2d 643 (1988)
EASTER SEAL SOCIETY FOR CRIPPLED CHILDREN AND ADULTS OF LOUISIANA, INC., et al
v.
PLAYBOY ENTERPRISES, INC., et al.
No. CA 7045.
Court of Appeal of Louisiana, Fourth Circuit.
August 16, 1988.
Writ Denied November 18, 1988.
*644 A.R. Christovich, Jr., Liane C. King, Christovich & Kearney, New Orleans, for appellants.
Bradley M. Smolkin, New Orleans, for appellees.
Before BYRNES, CIACCIO and LOBRANO, JJ.
CIACCIO, Judge.
Defendants appeal a judgment in favor of multiple plaintiffs, awarding damages for either false light invasion of privacy or defamation. Plaintiffs have answered the appeal seeking an increase in quantum and complaining of dismissal of certain claims and defendants. We hold that no claim by any plaintiff was actionable, and therefore, *645 render judgment in favor of defendants dismissing all plaintiffs' claims.
Acting on behalf of the Easter Seal Society, entertainer Ronnie Kole gathered numerous New Orleanians to stage a "Mardi Gras-style" parade and a "Dixieland" musical jam session. Some of the parade participants are plaintiffs. WYES, the New Orleans public television station, videotaped these events, charging less than market rates as an indirect charitable contribution to the Society.
WYES post-produced an edited, short segment (the "master" tape) from the raw video footage (the "field" tape) produced in real time during the events, using multiple cameras and sound equipment. The seventeen minute master tape was broadcast nationally in March 1982 as part of the Easter Seal Telethon. WYES did not keep a copy of the master, but kept the field tape on file, using portions of it subsequently in several WYES produced shows including a "Dixieland Jazz" series broadcast locally and distributed nationally.
Some time later, WYES director of broadcasting Julius Cain received a request from John Thompson, a Canadian television producer and acquaintance, for stock Mardi Gras parade footage. The testimony is conflicting as to whether Mr. Thompson accurately informed Mr. Cain of the intended uses for the requested footage. Mr. Cain sent forty minutes of tape copied from the field tapes. Mr. Thompson and his associates used portions of the field tape copy in an "adult" film entitled Candy, the Stripper.
The various defendants, other than WYES related defendants, participated in creating, producing, or distributing Candy. The movie was shown nationally on cable television a total of four times on two days during May 1983. One or more plaintiffs recognized themselves in the field footage now part of Candy.
By letter, counsel for the Society demanded that various defendants stop broadcasting Candy. In response to that request those defendants had the complained of footage removed from Candy. The Society then sued defendants for copyright infringement, see Easter Seal Soc. v. Playboy Enterprises, 815 F.2d 323, reh'g denied, 820 F.2d 1223 (5th Cir.1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988), and the Society along with almost fifty other plaintiffs, most of them individuals who participated in the parade, sued defendants for false light invasion of privacy or defamation.
The "false light" plaintiffs complain that their appearance in Candy, the Stripper was unauthorized, without their consent, and placed them in an objectionable false light before the public because the movie was a "PLAYBOY movie" which focused on sex and drugs. They allege that because of their appearances they have suffered ridicule and embarrassment. Five plaintiffs seek recovery for defamation, complaining that their reputations have been damaged because of their association with a project which ended up as part of a "pornographic" movie.
Invasion of privacy is a tort which, although impliedly recognized earlier by the courts, was originally articulated neither by the common law nor the statutory law but in a law review article, Warren and Brandeis, The Right to Privacy, 4 Harv.L. Rev. 193 (1890). Modern development of this tort has seen it analyzed into four distinct branches; the most prominent proponent of this analysis having been Dean William Prosser, see Prosser, Law of Torts Sec. 117 (4th Ed.1971) and Prosser, Privacy, 48 Calif.L.Rev. 383 (1960), whose position as reporter allowed his view to be incorporated into the current substitute for the general common law, the American Law Institute's Restatements, see Restatement (Second) of Torts Secs. 652 A-I (1977). There are advocates, such as Professor Blaustein, for a single-tort theory for invasion of privacy, see Eldredge, "The Law of Defamation" Sec. 56. Not all United States jurisdictions recognize a civil right to privacy, and of those that do recognize a civilly enforceable right of privacy, some do not recognize the "false light" subdivision, finding the interests properly protected thereunder already adequately served by actions in defamation, and that *646 any other interests within the scope of the false light action as generally recognized are not worth protecting at the expense of the more vital freedoms of speech and press. See Annotation, False Light Invasion of PrivacyCognizability and Elements, 57 A.L.R.4th 22 (1987).
Further confusion is spawned by a general failure to distinguish clearly between defamation and invasion of privacy, including the false light subdivision. Dean Prosser did not clearly make the distinction, and thus, his articulation of the concept conflicted slightly with what Warren and Brandeis had envisioned. The most recent edition of Prosser's hornbook, now edited by Professor Keeton, undertakes clearly to identify the interest in protecting personal dignity from false light invasions of privacy: "The action for defamation and the actions for invasions of privacy should be carefully distinguished. The former is to protect a person's interest in a good reputation.... The latter is to protect a person's interest in being let alone." W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts, Sec. 117 at 864 (5th ed. 1984).
In Winfield and Jolowicz on Tort (9th Ed.1971) the editors stated that there is "no English decision which recognizes an unqualified right of personal privacy," at p. 502, and that attempts to legislate on the subject have not met with success, at p. 504. Until recently, the French law treated what American law calls an invasion of the right to privacy as an example of faute under Civil Code Art. 1382, affirming that the categories of faute are never closed and that the sole question was whether the fault caused the plaintiff's damages. In awarding damages the early French cases treated the faute as a violation of a right of property. See F.P. Walton, The Comparative Law of the Right to Privacy, 47 L.Q.R. 219, at 220-221 (1931). Modern French commentators, however, have paid more attention to a "right to privacy." Carbonnier writes of an individual's secret sphere of life from which he may exclude third persons, recognizing a freedom which requires respect of the private character of his person and the right to be let alone. Carbonnier, Droit Civil (8th ed. 1969) as translated by Professor Wagner in (1971) Wash.Univ.L.Q. at p. 55. See F. Stone, 12 Louisiana Civil Law TreatiseTort Doctrine Sec. 191 (1977).
In Louisiana, as early as 1811 the courts recognized an implicit right to privacy as to one's letters, apparently hinging the right upon a writer's continuing property interest in his letters. Denis v. Leclerc, 1 Mart. (O.S.) 297 (1811). In Itzkovitch v. Whitaker, 115 La. 479, 39 So. 499 (1905), the court indicated that it would protect, by injunction, a presumably honest person's right not to have his photograph exhibited in a rogues' gallery. The court found the right in "equity" and considered it to be "personal." The court declared, "Everyone who does not violate the law can insist upon being let alone (the right of privacy). In such a case the right of privacy is absolute." The court immediately qualified this declaration, however, stating, "It must be said that there is some limit to this right, which is not necessary to discuss in this case." 115 La. at 482, 39 So. at 500. In a later case arising from the same dispute, Itzkovitch v. Whitaker, 117 La. 708, 42 La. 228 (1906), the court, quoting approvingly from the syllabus in Ryan v. Brown, 18 Mich. 196, 100 Am.Dec. 154, suggested that personal rights are protectable at equity for being secured by "constitutional laws."
Although the court opinions generally lack articulated attention to an identifiable system of critical analysis and development, such as consistency with any recognizable, traditional Civil Law approach, the modern Louisiana development of a personal, civil right to privacy and remedies for its tortious invasion have been based upon La.C.C. Art. 2315 "fault" (in a fashion comparable to the French) and a constitutional guarantee to freedom from unreasonable invasions of privacy, see La. Const. of 1974 Art. 1 Sec. 5. Louisiana courts have recognized that privacy concerns personal dignity, as compared with defamation which concerns reputation. We have characterized "false light" as protecting the "right to an inviolate personality." Jaubert v. Crowley Post-Signal, Inc., 375 So.2d 1386, *647 1388 (La.1979), citing Pack v. Wise, 155 So.2d 909, 913 (La.App. 3d Cir.1963), quoting Hamilton v. Lumbermen's Mut. Cas. Co., 82 So.2d 61, 63 (La.App. 1st Cir. 1955), writ denied 1955. In Jaubert Justice Dixon provided a comprehensive survey of the Louisiana cases on the subject. In that opinion the supreme court adopted, in wholesale fashion, the four branch analysis of Dean Prosser and the Restatement (Second) of Torts. 375 So.2d at 1388.
In his opinion Justice Dixon synthesized Louisiana jurisprudence to fit Prosser's four subdivisions. He pointed out that the right has been "variously defined" as "the right to be let alone" and "the right to an `inviolate personality.' "375 So.2d at 1388. He also, as is now customary in our approach to tort cases, identified and articulated a duty:
Where an individual has such a right, in the form of one of the interests outlined above, other members of society have a corresponding duty not to violate that right. A violation constitutes a breach of duty, or fault, and may be actionable under C.C. 2315.... Pack v. Wise, supra; Tuyes v. Chambers, 144 La. 723, 81 So. 265 (1919). When no such right to privacy exists, however, a person's conduct may be the cause of another person's embarrassment, discomfiture, or monetary loss, but it will not constitute a "legal cause," because no duty has been breached.
375 So.2d at 1388-1389.
Even where a right to privacy is found to exist, Louisiana courts have distinguished between invasions of that right which are actionable and those which are not. An actionable invasion of privacy occurs only when the defendant's conduct is unreasonable and seriously interfers with the plaintiff's privacy interest. Comment, The Right of Privacy in Louisiana, 28 La.L.Rev. 469 (1968). For an invasion to be actionable, it is not necessary that there be malicious intent on the part of the defendant. Lucas v. Ludwig, 313 So.2d 12 (La.App. 4th Cir.1975), writ denied 1975. The reasonableness of the defendant's conduct is determined by balancing the conflicting interests at stake; the plaintiff's interest in protecting his privacy from serious invasions, and the defendant's interest in pursuing his course of conduct.
375 So.2d at 1389 (footnote omitted).
We question first whether plaintiffs had a right to privacy related to any video tapes of their participation in the parade. There is no indication that the parade was a private affair, it was conducted publicly on Bourbon Street. Plaintiffs participated voluntarily, aware that they were being taped for national broadcast. There is no indication that any plaintiff placed any restriction on use of the video tapes which were used after the initial national broadcast in productions broadcast locally and distributed nationally (presumably for broadcast in other localities). There appears to be nothing at all private about the contents of the video tapes.
According to Dean Prosser, however, false light invasion of privacy, like tortious appropriation of the plaintiff's name or likeness, does not require the invasion of something secret, secluded or private pertaining to the plaintiff. Law of Torts Sec. 117 at 814 (4th ed. 1971). Such a position by Dean Prosser is unfortunate because it raises the question of why "false light" is considered a subdivision of invasion of privacy. The answer comes in recognizing that what is protected is something private pertaining to the plaintiff, his "inviolate personality," his private self, his image of himself.
Unknowable except to one's self is the hidden, private line between one's public displays and one's private self. The tort of false light invasion of privacy affronts that private self by publicizing a public display in a manner which is both unreasonable and false. If the publicity is an accurate portrayal of the public display, if the publicity is not unreasonable and false, then plaintiff has no actionable privacy interest, even if the publicity has caused embarassment, offense, or damage.
Defendant's duty is to avoid unreasonable invasions of plaintiff's "inviolate personality." There is no duty to avoid *648 reasonable, accurate publicity because it embarrasses and offends. "Fault" flows from conduct which is unreasonable and contains falsity or fiction.
It is initially the role of the court to determine whether false matter has the potential to place plaintiff in an objectionable false light; that is, the court initially determines as a matter of law whether defendant's conduct was unreasonable. In case of doubt or ambiguity, it then becomes a question for the trier-of-fact to determine whether, indeed, the publicity was understood to portray plaintiff in an objectionable way. The threshold question is a legal determination that requires a case-by-case analysis to illustrate the potential range of objectionable material. See 1 Privacy Law & Practice 1.04[5] (G.B. Turbow, editor-inchief, 1988); see also Roshto v. Hebert, 439 So.2d 428 (La.1983) (for recognition of the necessity of a case-by-case approach); compare Golden Bear Distr. Systems v. Chase Revel, Inc., 708 F.2d 944 (5th Cir.1983) (for a similar approach to defamation under Texas law).
Using the Jaubert analysis and its premise of a constitutional protection against unreasonable invasions of privacy, we correlate the determination of whether the publicity has the potential to place plaintiff in an objectionable false light with the Jaubert balancing test for determining reasonableness of defendant's conduct. Jaubert instructs us to balance the competing interests at stake: the plaintiff's interest in protecting his privacy from serious invasions, and the defendant's interest in pursuing his course of conduct. 375 So.2d at 1389.
In their pursuit of movie making, the movie defendants requested from the WYES defendants some stock film footage of Mardi Gras activity. The movie defendants used the video tape supplied to depict the public Mardi Gras celebration. Other than editing to use the particular scenes desired from the raw video footage, the defendants did not alter the tape or cause the parade participants to appear otherwise than as they were when originally captured on video tape.
At trial and in this court plaintiffs' counsel makes much use of the adjective "pornographic." While Candy contains nudity and apparent sexual intercourse, we are not prepared to call it "pornographic" in the sense that it violates our obscenity statute, see La. R.S. 14:106. Unquestionably, this is an "adult" film in which, we are prepared to assume, none of the plaintiffs would have chosen to appear as identifiable characters. Plaintiffs' appearances in the film, however, do not extend beyond their participation in a Mardi Gras parade.
We find no suggestion, implication, or innuendo connecting any parade participant with the subject matter of the film. The film is set in New Orleans during Mardi Gras. As the story line resolves, scenes of the parade passing on the street appear briefly, interspersed with the action of the main characters. Ultimately the main characters go out into the street to watch the parade. The only other parade scenes are behind the opening and closing credits.
In this film the parade is no more than part of the New Orleans backdrop in the same way that many movies make use of a city or cities as settings and include shots of urban activity through which the film's characters pass. As individuals, the parade participants are inconsequential. There is no reason to connect any parade participants, individually or collectively, in any significant way with the film's characters or subject matter.
Because the parade scenes are used only as backdrop, we fail to find any falsity or fiction in the portrayal of plaintiffs. Plaintiffs participated in a parade. The characters of the movie have no connection with or participation in the parade except to step out into the street while the parade is passing. The portrayal of plaintiffs is as nothing more than what they were, parade participants. There is no suggestion that these parade participants have any connection with the characters, themes, or action content of the movie. There is no portrayal of falsity or fiction; there is no "false light" portrayal.
*649 Plaintiffs attempt to extrapolate from the jurisprudence some rule that defendants should have obtained "consent" from each individual and represented group participating in the parade. We find neither jurisprudential nor statutory support for such a rule in these circumstances. In those cases where the courts have talked of the plaintiff's consent, either the disseminated material was clearly of a private character, see e.g. Lambert v. Dow Chemical Co., 215 So.2d 673 (La.App. 1st Cir. 1968) (photographs of a serious wound to plaintiff's thigh), and McAndrews v. Roy, 131 So.2d 256 (La.App. 1st Cir.1961) ("before" and "after" photographs relating to plaintiff's physical fitness and weight loss), or defendant relied upon consent as a defense, see e.g., McAndrews v. Roy, above (consent expired after ten years), and Braun v. Flynt, 726 F.2d 245 (5th Cir. 1984), cert. denied, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984) (consent found invalid because of defendant's deceptive misrepresentation). The jurisprudence establishes that plaintiff's consent, properly obtained, provides a defense, but it does not establish that lack of consent translates into liability. Consent, or lack thereof, is not an element of liability; liability is determined first, consent is a defense.
Plaintiffs also argue that we should consider a PLAYBOY movie, or any movie focusing on drugs and sex as objectionable and offensive per se. Plaintiffs contend that they neither subscribe to nor condone the attitudes and behavior portrayed as acceptable by the movie. We accept this contention as true, but do not agree that because a movie is produced and published by PLAYBOY and concentrates on drugs and sex that the movie is automatically objectionable and offensive to a reasonable person.
Plaintiffs rely on Braun v. Flynt, above. In Braun, a photograph of plaintiff appeared in Chic magazine, described by the court as a "glossy, oversized, hard-core men's magazine" devoted exclusively to sexual exploitation and to disparagement of women. She appeared individually, with her co-worker "Ralph the Diving Pig", and was highlighted in a section of the magazine entitled "Chic Thrills." Arguing that the entire magazine should be considered as the context in which her photograph appeared, plaintiff argued that an ordinary reader automatically will form an unfavorable opinion about the character of a woman whose picture appears in Chic magazine. The court added that even if an ordinary reader might not presume plaintiff to be unchaste or promiscuous, he might presume that she consented to appear in the magazine and approved of the opinions expressed therein.
In this case the record does not support a conclusion that either PLAYBOY or Candy, the Stripper should be categorized as being as socially unacceptable and offensive as the Braun court considered Chic magazine. Plaintiffs appear as participants in a parade which serves as no more than a backdrop and has no literary or logical connection to the movie's themes or characters, their attitudes and behavior. We do not find that any ordinary viewer automatically would form an unfavorable opinion about the character of any parade participant or presume that they consented to appear in approval of the opinions advanced by the movie. We conclude that in this case neither PLAYBOY nor Candy, the Stripper can be found per se objectionable or offensive vis a vis the plaintiffs.
Having reviewed the record and the movie, we do not find any actionable invasion of privacy. Defendants' further publication of plaintiffs' participation in a parade was neither unreasonable nor false. Although we accept plaintiffs' claims that they were genuinely embarrassed and offended, the rendering of their public display was not inaccurate and did not present their "inviolate personalities" in an objectionable false light. There was no unreasonable invasion of privacy.
Certain plaintiffs raised claims of defamation grounded essentially upon the same facts relied upon by the "false light" plaintiffs. To maintain an action in defamation plaintiffs must prove (1) defamatory words, (2) publication, (3) falsity, (4) malice, actual or implied, (5) resulting injury. Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La. 1980), and cases cited therein at p. 198. A *650 defamatory communication injures one's reputation, and has been defined generally as tending to expose plaintiff to hatred, contempt, ridicule, or obloquy and causing him to be shunned or avoided. See Prosser, Law of Torts Sec. 111 (4th ed. 1971), and 1 Privacy Law and Practice 1.04[1] (G.B. Turbow, editor-in-chief, 1988).
We pretermit whether a movie, or portion thereof, without "words" can satisfy the first element of defamation, "defamatory words." And it is clear that Candy, the Stripper was published by its broadcast four times on two days. But we find that plaintiffs have failed to show the remaining three elements of defamation.
As discussed above, the movie contains no falsity or fiction in its portrayal of plaintiffs. Further, plaintiffs have failed to show any malice, actual or implied, by defendants. Finally the record does not support a finding of injury to any plaintiff's reputation, certainly not of the sort tending toward hatred, contempt, ridicule, or obloquy causing any plaintiff to be shunned or avoided.
We hold, therefore, that as a matter of law plaintiffs have failed to establish the essential elements to sustain actions for either false light invasion of privacy or defamation. Accordingly, we reverse the judgment of the district court and enter judgment in favor of all defendants against all plaintiffs, dismissing plaintiffs' actions.
REVERSED.