### Saffron C.B. Jobin v. Eleanor McQuillen, et al.

[609 A.2d 990]

No. 90-146

Present: **Gibson, Dooley and Johnson, JJ., and Peck, J. (Ret.),**
**Specially Assigned**

Opinion Filed April 10, 1992

*Lori Ruple* of *Peterson & Ruple*, Jericho, for Plaintiff-Appellant.

*Michael J. Gannon* of *Pierson, Wadhams, Quinn & Yates*, Burlington, for Defendant-Appellee McQuillen.

*Robert L. Sand* and *Ritchie E. Berger* of *Dinse, Erdmann & Clapp*, Burlington, for Defendant-Appellee State of Vermont.

**Gibson, J.** Plaintiff Saffron C.B. Jobin appeals from the award of summary judgment to defendants, Chief Medical Examiner Dr. Eleanor N. McQuillen and the State of Vermont.

Plaintiff claims damages for mental, emotional and psychological distress caused by the removal and retention of her son's brain in connection with an autopsy authorized by statute. She challenges the superior court's conclusion that both defendants are immune from suit and that she has failed to make out a prima facie case. We affirm.

## I.

Plaintiff's 13-year-old son, Joshua Jobin, died at home on March 4, 1986, after suffering flu-like symptoms. He had cerebral palsy. Because it appeared that the boy had died of a treatable medical condition, unattended by a physician, Dr. McQuillen performed an autopsy the following day, pursuant to 18 V.S.A. § 5205(f). During the autopsy, she removed the boy's brain. On the death certificate and a preliminary autopsy report, both signed March 5, 1986, Dr. McQuillen cited pneumonia as the cause of death, and she authorized that the body be cremated.

Initial examination of the brain revealed no gross abnormalities, but a comprehensive analysis was not immediately possible because the brain had to be "fixed" in formalin, a stiffening agent, for approximately two weeks before it could be studied further. When the brain was ready for further study, it revealed substantial irregularities associated with a neurologic disorder. Dr. McQuillen issued a detailed autopsy report on April 21, 1986, in which she again concluded that the boy had died of pneumonia. The report also stated, "The entire brain is saved. Dr. Thomas Kemper, neuropathologist, Boston City Hospital, will be consulted when the case is completed as to his interest in receiving this brain for further study." Upon reading the report, plaintiff objected to the retention of her son's brain and demanded that it be returned to her. Dr. McQuillen agreed to return the brain, and plaintiff retrieved it on May 12, 1986 for cremation. Plaintiff brought this action on March 29, 1988.

In the course of discovery, plaintiff deposed Dr. McQuillen, who also submitted an affidavit with her motion for summary judgment. Plaintiff presented no independent expert testimony. Dr. McQuillen testified that it was essential to an accurate determination of the cause, manner and circumstances of the boy's death that his brain be removed and examined, that neu-

ropathologists who had studied the brain had recommended that it be examined further, and that Dr. Kemper might have been able to explain the relationship of the child's cerebral palsy to his death from pneumonia. She also testified, however, that further study of the brain had not been necessary to determine the cause of death, and that she had returned the brain to plaintiff because "it seemed more important to her . . . than my question to [Dr. Kemper]."

## II.

■ Summary judgment is appropriate if the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. V.R.C.P. 56(c). In the instant case, the underlying facts are not disputed. The court granted summary judgment to defendants, concluding that Dr. McQuillen was protected by qualified immunity and that the State had not waived its sovereign immunity. The court also concluded that plaintiff had failed to make out a case of either negligent or intentional infliction of emotional distress. We first consider whether plaintiff has made out a valid claim for relief. If she has failed to establish an element essential to her case, we must affirm the court's order. *Poplaski v. Lamphere*, 152 Vt. 251, 254–55, 565 A.2d 1326, 1329 (1989).

### A.

Plaintiff first sets out her common-law right to possession of her son's body as an independent basis for her claim. See *Nichols v. Central Vt. Ry.*, 94 Vt. 14, 16, 109 A. 905, 906 (1919). She argues that by removing and retaining the brain after the cause of her son's death had been determined, Dr. McQuillen exceeded her authority to conduct an autopsy and thus violated this right. Once pneumonia was established as the cause of death, plaintiff maintains, the State's interest in her son's body terminated, and Dr. McQuillen had no authority to retain the brain for further study.

■ We agree that the medical examiner is not authorized to retain body parts solely for scientific study, absent consent from the surviving spouse or next of kin. See *Crenshaw v. O'Connell*, 235 Mo. App. 1085, 1091, 150 S.W.2d 489, 491–92 (1941); *Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 679–80, 292 N.W.2d

816, 824 (1980). Dr. McQuillen's testimony does not suggest, however, that her interest in retaining the brain was purely academic. She testified that further study of the brain might have helped to explain exactly how plaintiff's son died, even though she had issued her final autopsy report, and that neuropathologists with whom she had consulted had recommended further study of the brain. 18 V.S.A. § 5202a(a) provides that the medical examiner may submit a correction of a death certificate up to six months after the date of death. The fact that Dr. McQuillen returned the brain when plaintiff requested it indicates only, as she testified, that she determined that it was more important to plaintiff that the brain be returned than it was to continue to investigate the precise cause of death.

■ Absent evidence that Dr. McQuillen exceeded her authority or deviated from the customary autopsy procedure, we do not think a jury could reasonably find that she breached plaintiff's common-law right to possession of her son's body by the temporary possession of the brain. Nothing in the information before the court in connection with the summary judgment motion shows that Dr. McQuillen exceeded her authority.

## B.

Consistent with modern authority, plaintiff's claim that Dr. McQuillen mishandled her son's body is perhaps better analyzed as one based directly on emotional distress. See Restatement (Second) of Torts § 868, comment a (1979) (claim based on interference with body is in reality one for emotional distress); W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 12, at 63 (5th ed. 1984) (claim of property right to body is of "dubious" validity; goal is protection of survivors' personal feelings). The appropriate question, therefore, is whether plaintiff has made out an emotional distress claim that can be recognized under Vermont law.

In *Nichols v. Central Vermont Ry.*, a mother claimed damages for mental suffering caused when a railroad employee negligently dropped a box containing her young son's body onto the tracks in front of a stopping train. The Court recognized a right in the surviving spouse or next of kin of a dead person to possess the corpse undamaged in preparation for burial, but declined to consider whether the plaintiff was entitled to nominal

damages because she had not raised the claim below. 94 Vt. at 16–17, 109 A. at 906. The Court affirmed a directed verdict for the railroad on the ground that the plaintiff was not entitled to damages for "mental suffering independent of physical injury . . . when occasioned by the mere negligent conduct of the defendant," distinguishing cases where the plaintiff was physically injured or where the mental suffering was the result of "wilful or malicious conduct." *Id.*

Plaintiff argues that Dr. McQuillen's removal and retention of her son's brain was willful, not negligent, and that *Nichols* thus does not bar her claim. We agree that Dr. McQuillen's actions were willful, in the sense that her retention of the brain was intentional and not accidental. We do not think, however, that her conduct falls within the meaning of the word as it is used in *Nichols*. There, in distinguishing the willful mishandling of corpses from the negligence alleged by the plaintiff, the Court wrote, "'in mere negligence there is no intent to offer indignity to, or wound the feelings of, another . . . .'" *Id.* at 20, 109 A. at 908 (quoting *Koerber v. Patek*, 123 Wis. 453, 465, 102 N.W. 40, 44 (1905)). The Court concluded that the cases cited by the plaintiff held only "that damages may be recovered by those entitled to the possession of a dead body for burial for mental anguish caused by its wilful or wanton mutilation." *Id.* Thus, the Court in *Nichols* simply recognized that a plaintiff could recover for mental suffering caused by intentional misconduct involving a corpse, such as would fit the more recently recognized tort of intentional infliction of emotional distress. See Prosser & Keeton, *supra*, at 63.

▇▇▇ Liability for intentional infliction of emotional distress can arise only from conduct so outrageous and extreme as to "'go beyond all possible bounds of decency.'" *Demag v. American Ins. Co.*, 146 Vt. 608, 611, 508 A.2d 697, 699 (1986) (quoting Restatement (Second) of Torts § 46, comment d (1965)). It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets this test. Restatement (Second) of Torts § 46, comment h. In the instant case, the evidence does not suggest that Dr. McQuillen intended to cause, or recklessly ignored the risk of causing, plaintiff to suffer emotional distress. In the context of an authorized autopsy, her conduct was not extreme and outrageous, and plain-

tiff's claim of intentional infliction of emotional distress was properly rejected.

## C.

■· Plaintiff also argues that she is entitled to damages on the basis of Dr. McQuillen's alleged negligence in exceeding her authority to conduct an autopsy on her son's body. Plaintiff has not alleged that she suffered physical harm, however, or that she was subject to a reasonable fear of immediate physical injury. Thus, like the plaintiff in *Nichols*, she has not made out a claim of negligent infliction of emotional distress, and this claim, too, was properly rejected. See *Vaillancourt v. Medical Center Hosp. of Vermont, Inc.*, 139 Vt. 138, 143, 425 A.2d 92, 95 (1980) (husband outside zone of danger could not recover for emotional distress caused by allegedly negligent care of wife during childbirth that resulted in death of fetus); *Guilmette v. Alexander*, 128 Vt. 116, 120, 259 A.2d 12, 15 (1969) (mother outside zone of danger could not recover for pain and suffering caused when she witnessed motorist negligently strike her daughter, causing severe injuries); cf. *Savard v. Cody Chevrolet, Inc.*, 126 Vt. 405, 410, 234 A.2d 656, 660 (1967) (child who was lightly showered with debris when a truck crashed into her house, but was not physically injured, could recover for emotional distress caused by fear of immediate physical injury).

Nonetheless, we recognize the special sensitivity that accompanies the handling of corpses. Some jurisdictions have held that, in cases involving the negligent mishandling of family members' corpses, plaintiffs need not allege additional elements of damage in order to recover for mental suffering. See, e.g., *Strachan v. John F. Kennedy Memorial Hosp.*, 109 N.J. 523, 538, 538 A.2d 346, 353 (1988) (seeking organ donation, hospital employees refused to disconnect dead son's body from life-support machinery against parents' wishes; court recognized duty to act reasonably in response to family's request); see also Restatement (Second) of Torts § 868 (1979) (one who intentionally, recklessly, or negligently mishandles body may be liable to family member entitled to dispose of it); Prosser and Keeton, *supra*, § 54, at 362 (noting cases allowing recovery for mental disturbance caused by mishandling of corpses in absence of further aggravating circumstances); contra, *Burgess v.*

*Perdue*, 239 Kan. 473, 480–81, 721 P.2d 239, 245 (1986) (mother could recover cost of reburying son's body with brain after doctor negligently failed to tell coroner that her consent to autopsy did not extend to removal of brain, but court affirmed summary judgment for doctor on mother's emotional distress claim because doctor's conduct was not intentional or malicious). In such cases, it is unlikely that the plaintiff can have suffered or feared physical injury, but "there is 'an especial likelihood of genuine and serious emotional distress, . . . which serves as a guarantee that the claim is not spurious.'" *Strachan*, 109 N.J. at 537, 538 A.2d at 353 (quoting Prosser and Keeton, *supra*, § 54, at 362).

In the instant case, however, we decline to address the continued vitality of *Nichols'* bar to damages for mental distress caused by the negligent mishandling of a corpse, because plaintiff has not made a showing sufficient to establish that Dr. McQuillen breached a duty to plaintiff. See *Poplaski*, 152 Vt. at 254, 565 A.2d at 1329. It is undisputed that Dr. McQuillen was authorized to conduct an autopsy on plaintiff's son. 18 V.S.A. § 5205(f) grants the state's attorney and the chief medical examiner authority to order an autopsy "if either deem[s] it necessary and in the interest of public health, welfare and safety, or in furtherance of the administration of the law." Further, 18 V.S.A. § 506 provides that "the chief medical examiner shall take and preserve . . . such portions of the body and its contents, together with such other articles as [s]he judges may require subsequent examination in the investigation of the case." As stated earlier, 18 V.S.A. § 5202a(a) provides that a death certificate may be corrected up to six months after death, and Dr. McQuillen testified that further study of the brain might have shed light on the exact cause of death. In this context, plaintiff has not made out a prima facie case of negligence against Dr. McQuillen.

Because we conclude that plaintiff has failed to make out a valid claim for relief, we need not address the question of Dr. McQuillen's and the State's immunity from liability.

*Affirmed.*