### Bernard A. Denton, Sandra Denton, and Their Minor Children v. Chittenden Bank and Christopher Bishop

[655 A.2d 703]

No. 93-247

Present: Gibson, Dooley, Morse and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned

Opinion Filed December 9, 1994

*John J. Collins* and *Michael J. Harris* of *Sutherland & Collins, Inc.*, Burlington, for Plaintiffs-Appellants.

*Heather Briggs* and *Patricia M. Sabalis* of *Downs Rachlin & Martin*, and *Philip D. Saxer* and *Julie E. Singleton* of *Saxer, Anderson, Wolinsky & Sunshine*, Burlington, for Defendant-Appellee Chittenden Bank.

*Robert R. McKearin* of *Dinse, Erdmann & Clapp*, and *Philip D. Saxer* and *Julie E. Singleton* of *Saxer, Anderson, Wolinsky & Sunshine*, Burlington, for Defendant-Appellee Bishop.

**Morse, J.** Plaintiffs Bernard and Sandra Denton, and their children Marc and Sara, appeal a summary judgment ruling in favor of defendants Chittenden Bank and Christopher Bishop dismissing their claims of (1) intentional infliction of emotional distress by Bishop; (2) invasion of privacy by Bishop; (3) breach of employment contract by the bank; (4) breach of an implied covenant of good faith and fair dealing by the bank; and (5) loss of consortium against both defendants. We affirm.

Plaintiffs allege that the facts of this case support the inference that Bishop embarked on an insulting, demeaning, and vindictive course of conduct toward Denton that included ridicule, invasions of privacy, intentional interference with ability to car pool, competitiveness in after-work sports, and an unreasonable workload, all of which so affected Denton's physical and mental state that he was forced to leave work on permanent disability. Because plaintiffs appeal from summary judgment, we recite the facts most favorably to plaintiffs, giving plaintiffs the benefit of all reasonable inferences.

Bernard Denton began working at Chittenden Bank as a maintenance employee in 1971. In 1981, the bank promoted him to assistant

vice-president in charge of buildings and grounds. His supervisor during this time was Richard Fletcher, who regarded Denton as a valuable employee and with whom Denton got along well. In early 1987, Fletcher left the bank, and Christopher Bishop assumed Fletcher's duties as part of a newly created supervisory position.

Before Fletcher left the bank, he apprised Bishop of Denton's strengths and weaknesses as an employee. He told Bishop that Denton was a "hands-on" supervisor who did not function well in areas requiring concentration on figures such as the production of reports, budgets, and forecasts. Fletcher cautioned Bishop not to "push" Denton, that Denton required careful supervision because he was so hardworking, and that it was difficult to get Denton to "slow down" and to take vacations. Under Fletcher's supervision, Denton set a demanding pace for himself, often working nights and weekends to finish projects. Fletcher described Denton as able to handle the stress of his job extremely well.

Bishop directly supervised Denton from April 1987 until October 1988. Bishop's management style did not agree with Denton. During that period, Bishop asked Denton to make reports and required him to meet deadlines. Denton worked more nights and weekends, including one Easter Sunday afternoon to complete his projects on time. Bishop at times shut off Denton's office telephone, telling him that he need not take calls because he needed to get work done. Bishop presented Denton with a dictaphone and suggested he use it to dictate memoranda while jogging so that he could get his work done quicker. Bishop also scheduled early morning meetings over Denton's objection that it would be difficult for him to attend as the Denton family had only one car. Bishop asked Denton to continue to work on and improve memoranda that Denton submitted in final form. Bank management praised only Bishop for a project that he, Denton, and members of other departments had worked on.

Not long after Bishop became Denton's supervisor, the growth of other departments in their building required the bank to move Bishop and Denton from private offices on the fourth floor to offices separated by sliding wooden doors on the fifth floor. Denton wanted these doors closed; Bishop wanted them open with their desks facing each other. As part of what Denton called a childish game, Denton repeatedly closed the doors and Bishop repeatedly opened them. Bishop also opened Denton's files and desk drawers while Denton was on two-month sick leave, on one occasion asked Denton to empty his brief case, and occasionally interrupted Denton's business meetings without knocking.

In this office, as well as after work, Bishop explained to Denton his dissatisfaction with other employees' job performance, and his hiring and firing decisions. Bishop made it abundantly clear that he weighed college degrees heavily in making these decisions. He explained that someone in Denton's position should have a degree and that people now being hired for like positions were required to have one. He made comments like, "It's too bad you don't have a degree," and "I hope we can work on one." Bishop went so far as to tell Denton that the Bank had done Denton an injustice in giving him his position.

Bishop also imposed himself on the Denton family during nonworking hours. He invited Denton to play basketball and volleyball, and changed into his athletic clothes at the Denton home. Denton did not feel comfortable turning down the invitations, and although he thought the request strange, permitted Bishop to change clothes at his home with no objection. Bishop was competitive during these games, often pairing off against Denton, and sometimes calling Denton "old man" in front of Denton's son, Marc, who came to watch his father play. On one occasion, Bishop happened upon Denton and his daughter at a ski resort, invited himself to ride the chair lift with them, told Denton he planned to fire one of Denton's coworkers, and challenged Denton to a race.

Early in April 1988, Denton told Bishop, his coworkers, and members of his family that he had the flu and left work on sick leave which ultimately lasted two months. In truth, Denton was feeling stressed about all the responsibilities Bishop assigned and fearful that he might lose his job. Bishop called the Denton home, as did other employees, approximately twenty times during that two-month period, either to ask Denton a question or to see how he was feeling. Bishop never spoke directly with Denton because the family members who answered the phone kept the conversations short.

On April 10, a Sunday, Bishop and his fiancée visited the Denton home. Mrs. Denton answered the door, and Bishop stepped inside. When Denton came over to the door, Bishop asked him about his health and whether he was on medication and seeing a doctor. The Dentons happened to be celebrating their daughter Sara's birthday, and although Bishop stayed near the front door while speaking with Denton, some guests overheard Bishop's questions.

Denton returned to work at the end of May 1988. He worked four months, taking short-term disability leave in October of 1988 and eventually long-term disability in October of 1989, claiming work-related stress. The bank terminated his employment shortly thereafter, although it paid his disability claims. This action followed.

The moving party on a motion for summary judgment must demonstrate that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. V.R.C.P. 56(c). In ruling on the motion, a trial court will give the nonmoving party the benefit of all reasonable doubts and inferences, and will regard the allegations in opposition to the motion as true, so long as those allegations are supported by "affidavits or other evidentiary material." *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409, 578 A.2d 98, 100 (1990). We review according to the same standards. *Id.* We include, however, hearsay information garnered from affidavits submitted by plaintiffs in support of their claims. This inclusion is harmless given our disposition. Cf. *Levy v. Town of St. Albans Zoning Board of Adjustment*, 152 Vt. 139, 145-46, 564 A.2d 1361, 1365 (1989) (affidavit must be based on personal knowledge to raise genuine issue of material fact).

## I. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show extreme and outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, that has resulted in the suffering of extreme emotional distress. *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990); *Demag v. American Ins. Cos.*, 146 Vt. 608, 611, 508 A.2d 697, 699 (1986).

As a threshold issue, the trial court must determine whether the conduct was so extreme and outrageous that a jury could reasonably find liability. *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992). The standard for establishing "outrageous" conduct is necessarily a high one. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965); see *Demag*, 146 Vt. at 611, 508 A.2d at 699 (plaintiff has "heavy burden to make out a case of outrageous conduct"). The trial court determined that, taking all of plaintiffs' allegations as true, Bishop's conduct did not, as a matter of law, reach the level of extreme outrage necessary to permit a jury to reasonably find liability. We agree.

■ We have never extended liability to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." See Restatement § 46 cmt. d. Because laws proscribing conduct must be

specific enough to give fair notice of what conduct will give rise to liability, we decline, on these facts, to extend liability to a series of indignities. Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous. Cf. *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1145 (5th Cir. 1991) (intentional and systematic humiliation of plaintiff in hopes plaintiff would quit not actionable without final demotion of vice president with college degree, thirty years' experience, and responsibility for company's largest construction projects to lowest janitorial position in particularly degrading and humiliating way); *Johnson v. Federal Reserve Bank*, 557 N.E.2d 328, 331 (Ill. App. Ct. 1990) (absent retaliation for disclosing illegal banking practices, excessive workload, verbal abuse, and denial of advancement not per se outrageous despite knowledge of employee's deteriorated health and subsequent need to avoid stress).

Plaintiffs argue, however, that our holding in *Crump*, 154 Vt. at 296-97, 576 A.2d at 448-49, would permit a reasonable jury to find Bishop's conduct actionable. In *Crump*, we stated that "if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-á-vis plaintiff, it may provide grounds for the tort [of intentional infliction of emotional distress]." *Id.* at 296, 576 A.2d at 448. Crump, an eighteen-year employee, was summarily dismissed after being falsely accused of theft, kept in a three-hour meeting with no opportunity to leave or have lunch, and badgered to sign a confession. In addition, the company defamed Crump by publishing reports that he was a problem employee because he was a thief. *Id.* at 288-89, 296-97, 576 A.2d at 444-45, 448-49. *Crump* stands for the proposition that the extreme and outrageous character of conduct may arise from the abuse of authority; it does not mean that supervisors may be held liable for "mere insults, indignities, or annoyances that are not extreme or outrageous." Restatement § 46 cmt. e; see also *Wilson v. Monarch Paper Co.*, 939 F.2d at 1143 (although intentional and systematic humiliation of employees often rises to level of illegality, it does not constitute extreme and outrageous conduct "except in the *most* unusual cases") (emphasis in original).

Plaintiffs next argue that Bishop's conduct was extreme and outrageous because Richard Fletcher had specifically warned Bishop

of Denton's "weaknesses and sensibilities." Otherwise unactionable conduct may become extreme and outrageous in character if an actor knows "that the other is peculiarly susceptible to emotional distress[] by reason of some physical or mental condition or peculiarity," and the actor proceeds in the face of that knowledge. Restatement § 46 cmt. f. Fletcher, however, described Denton's strengths and weaknesses solely in terms of Denton's suitability for performing certain types of work. The only susceptibility to emotional distress Fletcher mentioned was "stress," and he described Denton as able to handle the stress of his job extremely well. Further, Denton did not inform Bishop that he was under emotional distress or that Bishop was causing it. In deposition Denton stated, "I believe that my relationship to [Bishop] . . . never changed because I denied everything. . . . I showed this individual and to my friends, to employees, fellow employees total respect for this man." The record does not support a reasonable inference that Bishop knew Denton was susceptible to emotional distress.

Taking plaintiffs' allegations as true, *Messier*, 154 Vt. at 409, 578 A.2d at 100, a reasonable jury with proper instruction on the law could not find Bishop's behavior to be outrageous. Accordingly, we affirm the grant of summary judgment as to this count.

## II. Invasion of Privacy

Plaintiffs' invasion-of-privacy claim arises largely from the incident that took place during Denton's sick leave, when Bishop and his fiancée came to the Denton house while a birthday party for Sara Denton was in progress. Bishop entered when Mrs. Denton opened the door. He stayed by the door and inquired about Denton's condition, his doctor, whether Denton was taking any medication, and when he would be coming back to work. Plaintiffs were embarrassed and upset because their family and friends overheard the conversation.

Although plaintiffs contend that this incident is sufficient to sustain their claim of an invasion of privacy, they enumerate other incidents which, they assert, the trial court overlooked in granting summary judgment. These include the incident at the ski area; telephone calls to the Denton home during nonworking hours and while Denton was on sick leave; and Bishop's action in turning his desk to face Denton and opening the doors between their offices.

"The right of privacy is the right to be let alone." *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 162, 624 A.2d 1122, 1129 (1992) (citing

Restatement § 652A (1977)). Invasion of privacy is "an intentional interference with [a person's] interest in solitude or seclusion, either as to [the] person or as to [the person's] private affairs or concerns, of a kind that would be highly offensive to a reasonable [person]." *Id.* at 162, 624 A.2d at 1129 (quoting Restatement § 652B). The intrusion must be substantial. *Id.*

We agree with the trial court that Bishop's actions, especially asking questions in front of guests, were "unusual and possibly rude." We do not, however, find Bishop's actions to be substantial or to be an intrusion that would be highly offensive to a reasonable person. All of Bishop's questions concerned Denton's illness and absence from work. Because Denton told Bishop, his coworkers, and family that he was home with the flu, we do not attach great weight to Bishop's inquiries. Plaintiffs' subjective impressions to the contrary, Bishop's questions were not highly offensive under these circumstances. Accordingly, we affirm the grant of summary judgment on this count.

### III. Breach of Employment Contract

Plaintiffs have failed to preserve their breach of employment contract claim. Plaintiffs have not appealed the trial court's determination that Denton had an at-will employment contract with Chittenden Bank. Instead, for the first time on appeal, plaintiffs argue that Denton's discharge was contrary to the public policy exception to the employment at-will doctrine recognized by this Court in *Payne v. Rozendaal*, 147 Vt. 488, 494, 520 A.2d 586, 589 (1986). The only public policy issue raised below was in the context of a disability discrimination claim. Plaintiffs did not appeal summary judgment in favor of the bank on that claim. Because plaintiffs did not argue below that Chittenden Bank discharged Denton in violation of any other specific public policy of this state, the argument is not properly before us for consideration. Failure to raise a legal or factual reason why summary judgment should not be granted before the trial court precludes raising such a reason on appeal. See *Fitzgerald v. Congleton*, 155 Vt. 283, 295, 583 A.2d 595, 602 (1990) (applying rule to factual issues).

### IV. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs next argue that this Court should recognize an implied covenant of good faith and fair dealing in every employment contract and that we should find a breach of that covenant whenever conduct

by an employer is contrary to public policy. Plaintiffs argue that the Bank violated public policy because Bishop tortiously caused Denton's disability. Because we do not find Bishop legally responsible for Denton's disability, we do not reach this claim.

## V. Loss of Consortium

Because loss of consortium is a derivative action, *Derosia v. Book Press, Inc.*, 148 Vt. 217, 220, 531 A.2d 905, 907 (1987), and depends on the viability of the underlying tort claim, *Hay v. Medical Center Hospital*, 145 Vt. 533, 535, 496 A.2d 939, 942-43 (1985), plaintiffs' claims for loss of consortium necessarily fail.

*Affirmed.*

**Gibson, J.,** dissenting. Plaintiffs' complaint alleged that Christopher Bishop engaged in an intentional and systematic course of conduct to harass and intimidate Bernard Denton in both his work and private life. In support of this allegation, plaintiffs submitted depositions and affidavits from which a jury could reasonably find that Bishop acted beyond all possible bounds of decency by his humiliating public and private activities, his implied threats to Denton's job security, and by making it impossible for Denton to escape Bishop's presence. Because I believe that plaintiffs successfully presented genuine issues of material fact on their claims for intentional infliction of emotional distress and invasion of privacy, I dissent.

I begin with a restatement of the facts because, although the majority professes to "recite the facts most favorably to plaintiffs," I do not believe it truly fathoms or is fully sensitive to the ordeal to which Denton was subjected. Denton was an assistant vice-president of Chittenden Bank until 1988. He had worked for the company ten years before his promotion to an officer's position. After Bishop was hired as Denton's supervisor, the climate in which Denton worked changed significantly. The affidavits and deposition testimony support plaintiffs' allegations that Bishop, among other things: pressured Denton to produce reports on deadlines that required him to stay up all night and to work weekends, including an Easter Sunday; opened the sliding doors between their offices and reopened them if Denton closed them; moved his desk so as to face Denton directly; occasionally shut off Denton's telephone; scheduled meetings at times that interfered with Denton's ability to car pool; asked Denton to engage in business practices that Denton considered unethical; repeatedly

made derogatory references to Denton's lack of a college degree to both Denton and others; told Denton that the Bank did Denton an injustice by promoting him to assistant vice-president; taunted Denton about his writing skills; and took credit for Denton's work.

Plaintiffs alleged that Bishop not only harassed Denton at the office, but also insinuated himself into Denton's after-work personal life. He sought to compete against Denton in athletic activities and ridiculed him as an "old man" in front of his son Marc. When meeting Denton and his daughter Sara coincidentally at a ski area, Bishop insisted on riding the lift with both of them. Bishop also introduced Denton and Sara to the friend who accompanied him, and related his intention to fire and replace one of Denton's subordinates with the friend because he had a better education. Bishop then challenged Denton to a ski race, telling Sara to ski on ahead.

When Denton was out ill, and while he was on disability leave, Bishop called the Denton home constantly, looking for Denton. These calls were made during nonworking hours, at all hours during the day, in the evening, and on weekends. Plaintiffs also recount that one Sunday evening, when Denton was on disability leave, Bishop came with his fiancee to the Denton home unannounced and uninvited during a birthday party for Sara. Despite his fiancee's protests, Bishop entered the Denton home, and in front of the guests, questioned Denton about his condition and his medication.

Plaintiffs' affidavits show that, as a result of Bishop's conduct, Denton suffers from an ulcer, extreme depression and anxiety, and has been suicidal. He has undergone psychological and medical therapy for these problems. Denton's wife, Sandra, states that after Bishop became Denton's supervisor, things changed radically for the worse. She asserts that Denton talked constantly about Christopher Bishop's conduct toward him at work, and about the stress and anxiety he felt with Bishop as his supervisor. She relates instances of Denton's increasingly depressive behavior, stating that he was unable to sleep more than one hour each night, that his physical condition deteriorated, that he was nonfunctional for several months, talked of suicide, and could not remember routine items. She further explains that her husband's continuing problems seriously affected the family's life, causing her to worry about her children. The affidavits of Denton's daughter Sara, his son Marc, and his adult daughter Wanda Audette, contain similar observations of Denton's physical sickness and depressed attitude, and relate the effects of Denton's loss of confidence and self-esteem on the family.

The trial court found that plaintiffs' allegations did not rise to the level of outrage necessary to send the case to a jury on the intentional-infliction-of-emotional-distress claim. The majority correctly states that the trial court must decide initially whether the conduct alleged is sufficiently outrageous and extreme that a jury could reasonably find liability. *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992). It is fundamental in our jurisprudence, however, that where reasonable persons may differ, it is for the jury to make the ultimate determination. Restatement (Second) of Torts § 46 cmt. h (1965); see also *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994) ("If reasonable people may differ as to whether, given [the victim's] condition and circumstances, [the detective's] conduct was outrageous as well as obnoxious, the issue must be left to the jury."). Reasonable persons could readily disagree on the degree of outrage presented by the facts in this case.

There is no question that the standard for establishing outrageous conduct is a high one. The conduct must surpass "all possible bounds of decency, and . . . be regarded as atrocious[] and utterly intolerable in a civilized community." Restatement § 46 cmt. d; see *Demag v. American Ins. Cos.*, 146 Vt. 608, 611, 508 A.2d 697, 699 (1986) (plaintiff has "heavy burden to make out a case of outrageous conduct"). Further, the work environment may tolerate a level of teasing and taunting that in other contexts might be considered outrageous. *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir. 1991).

But even under this high standard, there are instances where the behavior fairly announces itself as outrageous. See, e.g., *id.* at 1145 (finding outrageous conduct in demeaning and humiliating way in which executive with college education and thirty-years' experience was demoted to janitorial position); *Pratt v. Brown Machine Co.*, 855 F.2d 1225, 1240 (6th Cir. 1988) (finding outrageous conduct where employer, despite knowledge that plaintiff was in dire financial straits and that company official had made numerous obscene telephone calls to plaintiff's wife and threatened to rape her, conditioned plaintiff's reemployment on plaintiff's agreement to apologize to official who had made calls, work directly under him, attend church and pray with him, and remain silent or risk losing his job). There are also cases where the behavior clearly is not outrageous. See, e.g., *Bourque v. Town of Bow*, 736 F. Supp. 398, 404 (D.N.H. 1990) (former town employee had no viable claim for intentional infliction of emotional distress where he alleged that town selectman stared at plaintiff and his wife for "a few minutes," upsetting them, and that supervisor ignited firecracker in vicinity of plaintiff's work).

There are closer cases as well, where reasonable minds may differ and a genuine issue of material fact may exist as to the level of outrageousness present in the alleged conduct. See, e.g., *Bower v. Weisman*, 639 F. Supp. 532, 541 (S.D.N.Y. 1986) (it was for trier of fact to determine if conduct "went beyond all reasonable bounds of decency," where defendant placed armed guards in lobby of townhouse occupied by plaintiff, preventing all but plaintiff, her children, and medical personnel from entering or leaving, changed locks on doors without consent, and entered apartment without permission to remove artwork); *Boyle v. Wenk*, 392 N.E.2d 1053, 1056 (Mass. 1979) (it is for jury to determine whether defendant's conduct was merely "rude and clumsy" or "extreme and outrageous" where defendant, a private investigator, called plaintiff asking questions about plaintiff's brother-in-law and was told by plaintiff not to call again because she was just released from the hospital, defendant repeated call at 1:00 A.M., and defendant told plaintiff's brother-in-law in front of plaintiff that defendant had been in jail for rape). I believe the present case falls squarely in the category of closer cases.

What distinguishes this case from "the vast realm of unpleasant and often stressful" workplace conduct, and makes it a closer case proper for a jury to consider, is that Bishop's conduct was not limited to the employment setting. He used his supervisory position over Denton to intrude upon Denton and his family in their private, nonworking life, and exploited Denton's known weaknesses. Whether Bishop's actions, examined together, were extreme and outrageous should have been left for a jury to decide.

The majority correctly states that conduct may be outrageous if it derives from a defendant's abuse of authority over the plaintiff. See *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990) (oppressive conduct and abuse of position of authority in terminating employment may provide grounds for finding intentional infliction of emotional distress); see also *Wilson*, 939 F.2d at 1145 (finding that supervisor "*intentionally and systematically* set out to humiliate [plaintiff] in the hopes that he would quit") (emphasis in original). But the majority goes on to assert that incidents should not be "consolidated to arrive at the conclusion that the overall conduct was outrageous." The law is clear, however, that a series of incidents may be considered together to determine if the conduct alleged is extreme and outrageous. See *Wenk*, 392 N.E.2d at 1056 ("Repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to war-

rant liability for infliction of emotional distress."); see also *Bower*, 639 F. Supp. at 541 (complaint alleging three separate incidents was sufficient to describe that defendant "embarked upon a course of conduct" designed to "intimidate, threaten and humiliate" plaintiff and trier of fact must determine if conduct was extreme and outrageous).

Ironically, in each of the cases the majority cites, the court did consider all of the defendant's acts together, not individually, in light of the parties' relationship to find that the conduct was outrageous. See *Wilson*, 939 F.2d at 1145 (employer engaged in outrageous course of conduct designed to humiliate plaintiff, and demotion to janitor completed employer's "steep downhill push to total humiliation" of plaintiff); *Johnson v. Federal Reserve Bank*, 557 N.E.2d 328, 330-31 (Ill. App. Ct. 1990) (Bank "engaged in pattern of abusive conduct" that met test for outrageousness because it "arose from an employment relationship in which the Bank held a position of authority, determining the nature, conditions, and duration of [plaintiff's] employment; the Bank's conduct, being retaliatory, served no legitimate purpose; and the abusive conduct continued even after the Bank knew of [plaintiff's] susceptibility to emotional distress").

In *Crump*, also cited by the majority, we found a genuine factual dispute on the outrageousness of defendant's conduct by looking at the acts together and in context:

> Plaintiff's evidence showed that defendant's representative summoned plaintiff to a lengthy meeting without notice, continued the meeting without a break for rest or food, repeatedly badgered him to amend and sign a statement, and that plaintiff did not feel free to leave the meeting. Immediately after the meeting, defendant's representative directed plaintiff to clean out his desk, a summary dismissal after eighteen years of service.

*Crump*, 154 Vt. at 296-97, 576 A.2d at 449. In light of the majority's reasoning in the present case, one could look at the acts in *Crump* and conclude that plaintiff suffered a mere insult, indignity or annoyance by being called into a meeting without notice, or by not getting a break for food or rest during the meeting, or by being badgered to sign or amend a statement, or by being summarily dismissed. I disagree that the law, as the majority suggests, requires the court to examine the facts at issue in this case in isolation.

Further, Bishop had been apprised of Denton's strengths and weaknesses by Richard Fletcher, Bishop's predecessor, and the

alleged behavior appeared to deliberately target Denton's weaknesses. See Restatement § 46 cmt. f ("conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of" knowledge that plaintiff is "peculiarly susceptible to emotional distress"); *Drejza*, 650 A.2d at 1316 (police officer should have known rape victim was vulnerable to emotional distress, and it was for jury to decide whether officer's comments to her about her lack of virginity and instruction to "take her little panties home" were extreme and outrageous). Taking plaintiffs' allegations as true, *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409, 578 A.2d 98, 100 (1990), a reasonable jury could readily find the alleged behavior to be outrageous.

In addition to evidence of outrageous behavior, plaintiffs must also present evidence sufficient to support the elements of causation and harm. See *Poplaski v. Lamphere*, 152 Vt. 251, 254-55, 565 A.2d 1326, 1329 (1989) (court will grant summary judgment if plaintiff fails to prove element essential to claim). Plaintiffs have presented more than sufficient evidence on the elements of causation and harm. I would therefore reverse summary judgment as to this count.

I would also reverse summary judgment on plaintiffs' invasion-of-privacy claim. Plaintiffs produced enough evidence to create a genuine issue for the jury regarding the offensiveness of Bishop's intrusion into plaintiffs' privacy. Bishop's repeated telephone calls, as well as his uninvited and unwelcome entry into the Denton home are legally sufficient to permit the claim to go to the jury. See Restatement § 652B cmt. d (when telephone calls are repeated with "such persistence and frequency as to amount to a course of hounding the plaintiff," cause of action for invasion of privacy will lie); see also *Love v. Southern Bell Tel. & Tel. Co.*, 263 So. 2d 460, 466 (La. Ct. App. 1972) (employer liable to employee for invasion of privacy where employer, concerned that employee may be injured, entered employee's trailer without permission with locksmith's assistance). I cannot agree with the majority's implication that an employer is privileged to hound an employee with persistent telephone calls and uninvited visits to the employee's home merely because the employer's purpose was to learn more about the employee's illness and absence from work. Reasonable minds could differ on the offensiveness of Bishop's method of inquiring about Denton's illness. Summary judgment, in my view, was improper.

I am authorized to say that Justice Johnson joins in this dissent.