*Lyman Hall, Inc. v. Steinhardt*, 438-10-17 Wrcv (Teachout, J., Jan. 4, 2019)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| Windsor Unit | Docket No. 438-10-17 Wrcv |

**LYMAN HALL, INC.,**
        **Plaintiff**

        **v.**

**DAVID STEINHARDT,**
        **Defendant**

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the Court for trial on September 26, October 24, and December 28, 2018.  Plaintiff seeks a judgment for unpaid monthly fees for property services.  Defendant does not dispute that the fees are unpaid or their amount.  Rather, he asserts several counterclaims based on the behavior of Plaintiff's officers and directors towards him. Plaintiff is represented by Attorney Evan Chadwick.  Defendant represents himself.

Based on the credible evidence, the Court makes the following Findings of Fact and Conclusions of Law.

#### Findings of Fact

Lyman Hall, Inc. is a corporation organized in 1976 that owns a 138-acre parcel of land in Rochester.  On an 11-acre portion of the land known as Quarry Hill, there are several houses with a dirt road that connects the houses and leads to the nearby town road.  Houses are individually owned, while Lyman Hall, Inc. owns the underlying land, manages the overall property, and provides services such as water, garbage removal, snowplowing, and road maintenance.  Brion McFarlin is the President, Treasurer, and a Director of Lyman Hall, Inc., and has lived there for 43 years.  Isabella McFarlin, his wife, is the Vice President, Secretary, and a Director. Both have long been active in the management of the Quarry Hill community.

David Steinhardt began residing at Quarry Hill in 1988 without an ownership interest and in 2003, Mr. Steinhardt purchased one of the houses, which is apparently a duplex.  When he did, he signed a Site Agreement governing the respective rights and obligations between himself and Lyman Hall, Inc.  Mr. McFarlin signed the agreement on behalf of the landowner Lyman Hall, Inc. as its President.

Under the Site Agreement, Mr. Steinhardt has the right to keep his house on the property for a period of 40 years and to use services such as roads, parking, the water supply, and sewage disposal, and to have access to electrical services. He is obligated to pay a monthly fee that was originally $250 per month, but increased to $280 per month as of January 1, 2013, and to pay town property taxes on his own house. There are specified land use restrictions, including prohibitions against excessive noise and keeping dangerous animals as well as other terms. Lyman Hall, Inc. is obligated to pay property taxes on the overall land, maintain necessary land permits, maintain the sewage disposal and water systems, provide plowing and mowing and garbage removal, and fulfill various other obligations. The Site Agreement specifies procedures upon a homeowner's default in obligations and a provision for dispute resolution.[1]

For approximately 10 years, Mr. Steinhardt paid the monthly fee without incident. In 2013, he began to experience financial difficulties, and made multiple late payments. By 2014, he had caught up and paid ahead. In 2015, he fell behind again. Mr. Steinhardt's primary work was editing books for college professors and this work had dried up. He was under personal financial stress. By the end of 2015, he had made payments only through March of 2015.

In February of 2016, Mr. Steinhardt emailed Mr. McFarlin about his financial difficulties. He stated that he had job interviews yet no job offers, but that he hoped to catch up by the end of the year. His personal financial stress had increased.

On April 21, an incident began that disrupted the relationship between Mr. Steinhardt and the McFarlins. On the death of the musician Prince, which was also the 20th anniversary of the suicide of a close friend, Mr. Steinhardt played Prince music in his house. Bruce Marshall, who lived in the other part of the duplex, complained to Ms. McFarlin about excessive noise. Mr. Steinhardt and Mr. Marshall had a telephone conversation over the issue, after which Mr. Marshall struck their shared wall, resulting in some damage to Mr. Steinhardt's bathroom wall. Ms. McFarlin contacted Mr. Steinhardt about the situation as part of her responsibilities as a Director and Officer of Lyman Hall, Inc. She suggested that he not play music so loud. He claimed that the music had not been loud and took offense that she appeared to side with Mr. Marshall.

Ms. McFarlin undertook efforts to resolve the conflict between Mr. Steinhardt and Mr. Marshall through multiple emails, starting on April 22 and continuing the next few days. She was concerned that they would injure each other, and proposed that they go to mediation. When her suggestion was not accepted, she shifted to recommending that both Mr. Steinhardt and Mr. Marshall call Mr. McFarlin.

Mr. Steinhardt did not take kindly to Ms. McFarlin's efforts and saw them as an attempt to meddle in his affairs. On April 22 he wrote to her that Lyman Hall "need have no role," although he continued mutual emails after that. On April 23 at 3:27 he wrote, "I

---

[1] This is a brief summary of provisions pertinent to this case; the Agreement consists of 11 single-spaced pages.

only ask to be left alone.  I now demand to be left alone."  Later that evening, she again emailed him and asked him to "communicate with Brion."  The next day, April 24, he wrote, "Again, I ask you not contact me in any fashion."  At this point, Mr. McFarlin became involved and instructed Mr. Steinhardt to contact only him and not to communicate further with Ms. McFarlin.

On April 25, 2016, the fifth day of the ongoing incident, hostility between Mr. Steinhardt and Mr. McFarlin boiled over.  Mr. McFarlin tried to contact Mr. Steinhardt multiple times.  Mr. Steinhardt called Mr. McFarlin and shouted at him and called him an a_____.  Despite Mr. Steinhardt's instruction to Mr. McFarlin not to contact him, but Mr. McFarlin continued to call to try to talk to Mr. Steinhardt.  When he got no answer, he left a voicemail and then made several successive phone calls in quick succession, leaving a series of voice mails.  Mr. Steinhardt considered this to be harassing behavior that invaded his privacy as he had said not to contact him.  This series of events transpired over five days during Passover, which is celebrated by Mr. Steinhardt, and was upsetting to him, and is the basis for some of his counterclaims.  Shortly after the day of the repeated phone calls, Mr. McFarlin sent Mr. Steinhardt an email about past due site fees.  In response, Mr. Steinhardt made a payment of $388 toward arrears.  This was the last payment he made.

The next event of note occurred a year later, in April of 2017.  Mr. McFarlin prepared and sent to Mr. Steinhardt by certified mail 5 notices of default.  Each of the 5 letters corresponded with nonpayment of site fees for a specific month in a prior year, specifically:  Nov 2015, Dec 2015, Jan 2016, Feb 2016, and March 2016.  When Mr. Steinhardt went to the post office, he saw that there were certified letters in his post office box, but he did not pick them up or sign for them, and they were returned to Mr. McFarlin.

Section 10 if the Site Agreement is entitled "Default" and section (a) provides as follows:

In the event Houseowner fails to
(i)     comply with the requirements of this Agreement, the Landowner may give written notice of the non-compliance to the Houseowner at any time up to one hundred eighty (180) days after Landowner first learns of the occurrence of the non-compliance (a "Notice of Default").  Upon the giving of such Notice of Default, the Houseowner shall take prompt actions to correct the default described in the Notice of Default.  If the default is cured within 10 days. . . [nonpertinent provision omitted] Houseowner's rights under this Agreement shall not be disturbed. If, however, Houseowner is in default of the same obligation three times in any consecutive twelve month period, then Houseowner's right to reinstate this Agreement shall expire and be of no force or effect, and thereafter Houseowner shall have no right to reinstate this Agreement; and

3

(ii)	cure the default described in the Notice of Default, Houseowner shall be deemed to be in default of this Agreement, and Landowner shall give Houseowner a written Notice of Termination of this Agreement and the Agreement shall be deemed terminated and all of Houseowner's rights hereunder shall expire and become of no further force or effect, but Houseowner shall not be relieved of and shall continue to be liable for any obligation that shall have accrued prior to the termination.

Section 21 of the Site Agreement is entitled "Dispute Resolution" and provides as follows:

In the event of a dispute or controversy arising out of or in any way relating to the subject matter of this Agreement, the parties will use their good faith efforts to resolve such dispute or controversy within 30 days and without resorting to litigation, such efforts to include good faith negotiations and participation in mediation. If such efforts are unsuccessful, the parties agree to have any remaining dispute or controversy resolved by binding arbitration. The prevailing party (as determined by the arbitrator) in any such arbitration shall recover from the other party all costs, disbursements and reasonable attorneys' fees incurred in connection therewith. . . .[non-pertinent material omitted]

In each of the 5 letters, Mr. McFarlin stated that the letter "serves as a Notice of Default . . ." and "per section 21 (Dispute Resolution) of the site agreement, as a notice that mediation, followed by binding arbitration if necessary, is needed to resolve this issue."

On April 27, 2017, "Aaron," "Trevor," and others showed up and bulldozed an area in front of Mr. Steinhardt's site. "Trevor" was at the wheel of the tractor. Mr. Steinhardt believes that they were there as agents of Lyman Hall, Inc. to intimidate him. There is no evidence, other than Mr. Steinhardt's suspicions, to support this. There is no specific evidence about exactly what was done or its purpose, or where the bulldozing occurred in relation to Mr. Steinhardt's home.

As of June 3, 2017, Mr. Steinhardt had not read the letters. On June 3, 2017, Mr. McFarlin wrote another letter to Mr. Steinhardt in which he enclosed copies of the 5 prior Notice of Default letters. He further wrote, "Please review Site agreement Section 10(a)(i); since you have been in default on the site fee more than 3 times in the last twelve months your right to reinstate this agreement has expired. Per site agreement section 12 (Dispute Resolution) this letter serves as notice that mediation followed by binding arbitration, if necessary, is needed to resolve this issue."

Mr. Steinhardt opened the letter on June 17, 2017. The next day, June 18, 2017, Mr. McFarlin knocked on Mr. Steinhardt's door and delivered another envelope with a similar letter dated June 2, 2017 again containing photocopies of the 5 prior Notice of

4

Default letters. During the interaction, both men attempted to make a video recording of the other on cell phones or other electronic devices, but otherwise there was no conflict. Mr. McFarlin left without incident.

On June 29, 2017, Lyman Hall, Inc.'s attorney wrote a letter that was served on Mr. Steinhardt on July 1, 2017 by constable. It claimed that "your default in excess of three times in a 12 month period has voided the Agreement, allowing us to immediately file a foreclosure action in Vermont Superior Court," and demanding arbitration pursuant to the Site Agreement.[2]

On July 28, 2017, Mr. Steinhardt wrote a letter in response in which he claimed an "exemption" from mediation and arbitration and stated that he intended to assert counterclaims and seek punitive damages.

On July 31, 2017, Mr. Steinhardt took a video of Mr. McFarlin in which he claims that Mr. McFarlin behaved in a physically abusive manner toward a third person, and then tried to intimidate Mr. Steinhardt into giving up the video. The evidence about this entire incident is not sufficiently specific for the court to find intimidation on the part of Mr. McFarlin.

In September and October, Mr. McFarlin burned material in a fire pit on the property. The material consisted of lumber from razed cabins, furniture, and "stuff" from the farmhouse. Mr. Steinhardt claims that it was toxic and done deliberately to interfere with his rights to enjoy property. Mr. McFarlin claims that the material was not toxic. The evidence shows that some of the burned furniture had metal parts, but the court does not have evidence that the material burned was toxic. It is unknown exactly how far away the burn pile was from Mr. Steinhardt's home.

There is a pile of remains of a derelict cabin somewhere in the vicinity of Mr. Steinhardt's home. He says it is 15 to 20 feet away. He faults Lyman Hall, Inc. for not removing it. These remains were located on the property at the time Mr. Steinhardt purchased his home in 2003.

On October 6, 2017, Plaintiff filed this suit, initially seeking binding arbitration pursuant to the Dispute Resolution provision of the Site Agreement. Mr. Steinhardt filed an answer stating that he did not wish to go to arbitration and he asserted counterclaims. Plaintiff filed a motion to amend the complaint to remove the request for arbitration and proceed to litigation, and the motion was granted.

---

[2] Despite the statements in the June 3rd and June 29th letters that Mr. Steinhardt's rights under the Site Agreement had expired, Plaintiff has not pursued that relief in this case. In fact, Lyman Hall, Inc. has continued to provide services to the present, and seeks as relief only a money judgment for unpaid site fees.

Mr. Steinhardt claims that the notices he received were not proper because they contained improper content. Specifically, he claims that the demands to go to mediation and, if necessary, arbitration, were "unlawful content." Nonetheless, he does not dispute liability for the site fees. As of October 31, 2018, the amount of arrears was $9,520. With the addition of fees for November and December, the total amount due as of December 31, 2018 is $10,080.

Mr. Steinhardt has rented out a room in his house on AirBnB at least 65 times, and received approximately $4,000-5,000 in income. There are 59 reviews that show that he is a "Superhost." He rates 5 stars as a host and the reviews contain many positive comments.

## Conclusions of Law

*Plaintiffs' Claim for Unpaid Monthly Fees for Property Services*

The evidence reflects and Defendant concedes that he has not complied with the obligation to pay monthly property service fees and he does not dispute the amount claimed by Plaintiff. Accordingly, the Court concludes that Plaintiff is entitled to recover $10,080 for unpaid site fees through December 31, 2018.

*Defendant's Counterclaims*

Defendant asserts six counterclaims based on the conduct of Mr. McFarlin and Ms. McFarlin against him in their capacities as officers and directors of Lyman Hall, Inc. Mr. Steinhardt has proved that all behavior in evidence on the part of both McFarlins was done in their capacities as officers and directors and on behalf of Lyman Hall, Inc. Any claim must be proved by a preponderance of the evidence.

1. *Defendants' Claim of Intentional Infliction of Emotional Distress*

There are three necessary elements for such a claim: (1) the conduct must be extreme and outrageous, (2) it must be done intentionally or with reckless disregard of the probability of causing emotional distress, and (3) it must result in suffering of extreme emotional distress. *Denton v Chittenden Bank,* 163 Vt. 62 (1994). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id*. at 66 (quoting Restatement (Second) of Torts § 46 cmt. d).

The Court cannot conclude that Mr. Steinhardt has met the requisite burden of proof on these elements. A conflict clearly developed between Mr. Steinhardt and the McFarlins, and Mr. McFarlin in particular, during the five days in late April of 2016. However, it included provocation by Mr. Steinhardt himself when he shouted at Mr. McFarlin over the phone and used a nasty epithet. Mr. McFarlin's conduct in leaving repeated successive unwelcome voicemail messages, while inappropriate, was not

6

extreme or outrageous so as to meet the high bar of "atrocious and utterly intolerable" conduct. *Denton*, 163 Vt. at 66.

Additionally, while Mr. Steinhardt no doubt suffered emotional distress during that period, the evidence shows it had several causes: personal financial distress, emotional reaction to the death of Prince and the anniversary of the suicide of a friend, and the conflict with Mr. Marshall, including Mr. Marshall having smashed his wall. As such, the Court is unable to conclude that any emotional distress suffered by Defendant resulted from the acts of Plaintiffs.

In any event, the evidence does not support Mr. Steinhardt's claim that they were intentionally trying to cause him stress. As set forth in the findings, Ms. McFarlin sent multiple emails to Mr. Steinhardt after conflict erupted between him and Mr. Marshall stemming from Mr. Steinhardt's playing the music of Prince in April 2016. In similar fashion, Mr. McFarlin clearly did call Mr. Steinhardt several times in quick succession on April 25, 2016 and left multiple voicemails after Mr. Steinhardt had told him that that he did not wish to be contacted, and such conduct was clearly intentional. However, the evidence is credible that the McFarlins sought to communicate with Mr. Steinhardt in exercising their responsibilities to minimize conflict between residents at Quarry Hill— specifically between Mr. Steinhardt and Mr. Marshall—and not because of animosity towards Mr. Steinhardt or an attempt to cause him stress.

Mr. Steinhardt's argument that the sending of Notices of Default by Mr. McFarlin amounted to intentional infliction of emotional distress is not supported by the evidence. The sending of such notices was a legal act entirely justified by the terms of the Site Agreement in light of Mr. Steinhardt's nonpayment of site fees. It does not constitute extreme and outrageous conduct going "beyond all possible bounds of decency." *Id.*

With respect to the other events relied on by Mr. Steinhardt, intentional conduct has not been proved. Mr. Steinhardt asserts as intentional conduct causing him extreme emotional distress the bulldozing in front of his house, Mr. McFarlin's attempt to intimidate him to give up a video Mr. Steinhardt had made of Mr. McFarlin's conduct, and burning of toxic material in a fire pit near his home. Mr. Steinhardt has not proved that when Trevor and others did bulldozing in front of Mr. Steinhardt's property in April of 2017, they were doing so as authorized agents of Lyman Hill, Inc. or that the activity was done with an antagonistic purpose.

As to Mr. McFarlin's alleged conduct in intimidating Mr. Steinhardt after Mr. Steinhardt had videotaped Mr. McFarlin, there is simply a lack of specific evidence about exactly what occurred during that interchange. The burden of proof of showing that Mr. McFarlin's conduct was deliberately intimidating has not been met.

Similarly, there is insufficient proof that the burning of material in the firepit was done in a manner intended to antagonize Mr. Steinhardt or interfere with his enjoyment

of his property, or that the material burned was toxic. There is also no evidence that the remains of the derelict cabin interfere with his use and enjoyment of his home.

Thus, the Court concludes that Defendant has failed to meet his burden as to each of these claims.

## 2. *Defendants' Claim of Negligent Infliction of Emotional Distress*

Traditionally, such a claim required the plaintiff to be in the presence of physical injury. The Vermont Supreme Court might, in the future, allow such a claim in the absence of physical injury if the following elements are proved: (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being; (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff; and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff. *Vincent v. DeVries,* 2013 VT 34, ¶ 18, 193 Vt. 574, 583.

Mr. Steinhardt has not shown the kind of special relationship that would allow this cause of action to be recognized in Vermont absent physical injury. In this case, the relationship between Mr. Steinhardt and the McFarlins is established by the terms of the Site Agreement. This agreement sets forth rights and obligations related to property interests and resolution of conflicts over those interests. No terms call for Lyman Hall, Inc. to undertake responsibility for Mr. Steinhardt's emotional well-being. He is therefore unable to prevail on this claim.

## 3. *Defendants' Claim for Invasion of Privacy*

The elements of this claim are: (1) substantial, intentional intrusion upon the solitude or seclusion of another, or upon his private affairs or concerns, that (2) would be highly offensive to a reasonable person. *Harris v. Carbonneau,* 165 Vt. 433, 439 (1996).

Mr. Steinhardt has proved that on April 25, 2016, he told Mr. McFarlin not to call him again, and that despite the request, Mr. McFarlin called him several times in quick succession, leaving voicemails each time. The Court concludes this conduct was intentional and constituted an intrusion into his privacy that Mr. McFarlin knew or should have known was unwelcome. Any reasonable person would find it highly offensive to have told someone not to call again, only to have the telephone continue to ring multiple times with unwanted voicemail messages left each time.

On the other hand, the Court does not find Mr. McFarlin's personal delivery of a Notice of Default letter to Mr. Steinhardt in person at his residence on June 18, 2017 to constitute an invasion of privacy. Notice was called for in the Site Agreement. Mr. McFarlin was there for a legitimate legal purpose. When Mr. Steinhardt opened the door, he delivered the letter and left. While both men attempted to take video of each other, under these circumstances there was no intrusion upon solitude or seclusion.

8

Mr. Steinhardt has proved this cause of action only as to the phone calls on April 25, 2016. As to damages, the time period was brief, and the conduct did not occur again, even though the issue about nonpayment of site fees was ongoing for over another year. Because of the minimal impact, the Court awards damages in the nominal amount of $50.

4. *Defendant's Claim for Deceit/Fraudulent Misrepresentation*

To establish fraudulent misrepresentation, one must show a misrepresentation by (a) a false statement, known to be false by the one who made the statement, or by (b) concealment of facts by one who has a duty to disclose those facts. See *Estate of Alden v. Dee,* 2011 VT 64 ¶ 32. 190 Vt. 401, 415; *Fayette v. Ford Motor Credit Co.,* 129 Vt. 505, 510 (1971). The misrepresentation must further be relied on by the plaintiff in acting or refraining from action, and the reliance must be justifiable. *Sugarline Assocs. V. Alpen Assocs.,* 155 Vt 437, 445 (1990).

Mr. Steinhardt claims that the statements in the April 2017 Notice of Default letters that "mediation, followed by binding arbitration if necessary, is needed to resolve this issue" are fraudulent misrepresentations. As quoted above, the Site Agreement called for resolution of disputes by mediation, followed by arbitration if necessary. Whether prerequisites needed to be completed first, such as a time period to cure, does not make the statement a false one. In any event, no such statement was relied on by Mr. Steinhardt, as he interpreted the Site Agreement for himself. The evidence does not support proof of any of the elements of this cause of action.

5. *Defendant's Claim for Abuse of Process*

Abuse of process is proved with evidence that shows: (1) an illegal, improper or unauthorized use of a court process; (2) an ulterior motive or ulterior purpose; and (3) resulting damage to the plaintiff. *Jacobsen v. Garzo,* 149 Vt. 205, 208 (1988).

Here, the court process used by Plaintiff was the filing of the instant action where the original complaint requested an order compelling arbitration, which is what the parties had agreed to in the Site Agreement in the event of a dispute. By the time the suit was filed in October of 2017, Mr. Steinhardt had received several notices of default and had sufficient opportunity to cure the default. He had also indicated in his letter of July 28, 2017 that he declined to participate in arbitration and that he was asserting claims against Lyman Hall, Inc. There was clearly a dispute, and it was proper for Lyman Hall, Inc. to invoke the court process to compel arbitration, or, alternatively, litigation, to resolve the parties' disputes. Mr. Steinhardt has not proved that the filing of this case was an abuse of process.

6. *Defendant's Claim for Private Nuisance*

Three elements must be proved to establish a claim for private nuisance: (1) an interference with the use and enjoyment of another's property; (2) the interference is

9

unreasonable, and (3) the interference is substantial. *Myrick v. Peck Elec. Co.,* 2017 VT 4 ¶ 4, 204 Vt. 128, 131.

In this case, Mr. Steinhardt fails to point to any evidence that either the burning in the fire pit or the failure to remove the remains of the derelict cabin have interfered in any way with his use and enjoyment of his home. To the extent that Mr. Steinhardt offers proof of the burning in the fire pit and the existence of the derelict cabin, in themselves, as evidence of diminished use and enjoyment of his home, the Court concludes that any effect is neither substantial nor unreasonable.

7. *Defendant's Claim for Exemplary Damages*

The elements to be proved for exemplary or punitive damages in Vermont are: (1) wrongful conduct that is outrageously reprehensible, and (2) malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like. *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.,* 2010 VT 33, 187 Vt. 541.

Defendant has proved only the counterclaim for invasion of privacy. While the elements were met, Defendant has failed to establish that the impact was more than minimal. The necessary standard required for an additional award of exemplary or punitive damages—outrageous conduct done with malice—has not been met. Thus, no exemplary damages are awarded.

*Attorneys' Fees*

Plaintiff requests attorneys' fees. Plaintiff shall have a period of time to file a specific request for attorneys' fees supported by time and billing records and a memorandum about the legal basis for fees under the circumstances of this case. Defendant shall have two weeks to file an objection to the request. The Court will then issue a ruling on the request.

**Order**

Plaintiff's counsel shall submit a request for attorneys' fees as described above no later than January 21, 2019. Defendant shall have fourteen days after the request is filed to file any objections.

Dated  this      day of January, 2019.

_____
Hon. Mary Miles Teachout
Superior Judge

10